**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin FEARN, Jr., Defendant-Appellant.**

**No. 78–1199.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1978.
Decided Dec. 29, 1978.

Edward Neville, East St. Louis, Ill., for defendant-appellant.

R. Michael Hursey, Asst. U. S. Atty., Belleville, Ill., for plaintiff-appellee.

Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal raises the questions of whether a conviction must rest upon firmer ground than the uncorroborated admission of the accused and whether in this case there is sufficient corroboration in the other evidence adduced at the trial to sustain the conviction.

The defendant was charged in Count I with making a false material statement for the purpose of obtaining a Small Business Administration loan by stating in an application that damage occurred to personal property located at 612 North 41st Street, Apartment 6, East St. Louis, Illinois, whereas no such damage occurred, in violation of 15 U.S.C. § 645(a). On the basis of the same facts, he was further charged with making a false statement of a material fact by executing a Disaster Loan Agreement (Count II) and a Completion Certificate for a Disaster Loan (Count III) in violation of 18 U.S.C. § 1001.

A jury found the defendant guilty of all three counts. He was sentenced to two years' imprisonment on Counts I and II, to run concurrently, and placed on probation for five years on Count III, to be consecutive to the term of imprisonment.

I

As the result of flooding in March and April of 1973, St. Clair County, Illinois, was declared a disaster area by presidential declaration. Persons who suffered flood-related damage were eligible for loans up to $10,000 for personal property damage or a total of up to $50,000 real and personal property damage. Up to $5,000 of each disaster loan was subject to being forgiven. Disaster loans were made through the Small Business Administration (SBA) and approximately 2300 flood-related disaster loans were made by the SBA in St. Clair County in 1973.

On April 28, 1973, the Mississippi River at St. Louis reached its highest level ever recorded, over 13 feet above flood stage. East St. Louis is in St. Clair County and is situated on the Mississippi River, across the river from St. Louis, Missouri. The river level had reached almost six feet above flood stage by April 22, 1973, which was Easter Sunday, making it an easily recollected day for most of the witnesses who appeared.

The defendant is the Director of Social Services for the East St. Louis Housing Authority. On the Saturday night preceding Easter Sunday in 1973, defendant's supervisor, who was the Director of the Housing Authority, called the defendant and advised him that as the result of a power failure and high rising water backing up from the sewers an emergency had developed at two housing developments—the John Robinson Homes with 144 units and

the John DeShields Homes with 300 units. The defendant was told to go to these two housing developments, which were about two miles from his own apartment at 612 North 41st Street, Apartment 6, East St. Louis, to assist the tenants, who were experiencing flooding of their apartments. The defendant was not able to return to his own apartment until the following Monday afternoon which was April 23, 1973.

The defendant testified that when he reached his own apartment, which as a bachelor he inhabited alone, he found water about 1½ inches high on the floor. His rugs and carpets were soaked, his television set which was located on the floor was wet, and a distinct odor pervaded the apartment.

In accordance with the procedure established by the SBA for the processing of disaster loans, the defendant first went to an informational office in East St. Louis and was directed to an office on Ninth Street, where he filled out a card, verbally discussed his damages with an employee, and was given an application form. The written application for the disaster loan, including an inventory of personal property damage, was signed by the defendant on July 30, 1973 and received by the SBA on July 31. The defendant specified that the disaster occurred on April 22, 1973 and itemized personal property damaged with a total estimated amount of $5,755. When the application was filed, the defendant supplied to the SBA receipts showing the cost of replacement items.

On August 19, 1973, Walter McIntosh visited the defendant at Apartment 6, 612 North 41st Street, for the purpose of verifying defendant's claim in accordance with established SBA procedure. Mr. McIntosh was then a community college teacher who had formerly worked as a loan verifier for SBA in the summer of 1972 on California earthquake damages, and because he had a good record on those claims, was reemployed during the summer of 1973 for the Illinois flood damage claims.

McIntosh testified that most of the East St. Louis claims were for personal property in the form of clothing, that since the flooding occurred in April and the damage claims were verified in August, most of the damaged clothing and other personal property had been discarded by the owners because it carried disease, and that the claimants were told to dispose of water-damaged personal property because of the danger of disease.

The defendant's written inventory of claimed personal property damage included a television set, a stereo set and records, carpets, a vacuum sweeper, two "commodes" or cabinets which the defendant had at each end of his sofa, and clothing which had been stored in cardboard boxes. On the inventory form, the loan verifier had written "Discussed guidelines of program and cost total differences with applicant" and "Applicant's estimate relatively high." The verifier had then eliminated entirely several of the claimed items, reduced the cost of all remaining items, and concluded with a "verifier's estimate" of "p.p. 1600" or personal property damages of $1600. McIntosh testified that 15 to 20 of the claims he examined that summer were turned down completely because he found no damages at all. He also testified that if he saw waterlines, he would ordinarily take pictures of them with his Polaroid camera. The defendant testified that he showed McIntosh a white substance around the two commodes and stereo, whereupon McIntosh took several Polaroid pictures. The SBA file of defendant's disaster loan contained only one Polaroid picture and that was of the outside of Apartment 6.

A loan specialist for SBA testified that the loss verifier's report "is a very determining factor in whether the loan is approved or not and if so, for what amount." Defendant's loan was approved on September 24, 1973. On September 27, the defendant signed the Disaster Loan Agreement in the amount of $1600. On the same date, a check was issued to him for that amount.

The loan specialist also testified that the defendant would not have known when the loan was made that it was cancellable or subject to being forgiven or, if so, when it would be cancelled or forgiven. If the

terms of the loan agreement were not fulfilled, the recipient of the loan would be required to pay back one-and-one-half times the amount of the loan. In this case the loan agreement provided that if the loaned sum of $1600 was not used as directed by the SBA, the defendant would be required to repay $2400. The defendant testified that at the time he made his application he did not know that the loan would be forgiven, and it was not actually forgiven until about a year later. However, the loan agreement had the words "Total Cancellation" on it directly under the caption "Disaster Loan Agreement."

On September 4, 1974, the defendant signed the Completion Certificate for Disaster Loan certifying that the funds were used by the defendant as authorized by the SBA. Presumably at that time the $1600 proceeds were forgiven as a loan.

## II

The crucial issue in the trial occurred during the testimony of James Trione, who said he was in the liquor, real estate, bookkeeping, income tax and investments business. He testified that in 1972 he became the contract purchaser of a 19-unit brick garden apartment complex located at 612 to 624 North 41st Street in East St. Louis, constituting him as the defendant's landlord. He testified that in September or October 1973, he and the defendant were alone in the defendant's living room, when the following took place:

Q. And could you tell the jury what Mr. Fearn said to you at that time about any flood loan?

A. As best as I remember, word for word, he told me that he would pay me the back rent that he owed me—which at that time was only a couple hundred dollars. It wasn't very much; three hundred at most. He would pay me the back rent that he owed me when he got his loan and then he changed it from loan to grant, from the Federal government for flood damage and I asked him at that time if it was for some rental property that he had and he said, no, it was for

damage to this apartment, at which time I looked around the apartment and looked to see if I could see any damage and he said, well, there was no damage. And I said, well, how can you get the money then? And he said, well, everybody is. Everybody's getting it. And he said he would pay me when this loan came in, or this grant came in.

Q. Did he say how much he was going to get?

A. He told me he was going to get $5,000.00.

Q. Did he say he had applied for a loan?

A. Yes, he did.

Trione testified that he told Maurice Hurst, a special agent for the Federal Bureau of Investigation, about the defendant's admission when Hurst had interviewed him several times prior to the trial. The defendant moved for a mistrial on the ground that a pre-trial discovery order had required the government to furnish the defendant with "written or recorded statements or confessions made by the defendant." The prosecutor represented to the court outside the presence of the jury that he first learned from Trione about defendant's admission two days earlier in a conversation with Trione in Hurst's presence. The government had earlier provided the defense with Agent Hurst's reports of six interviews he had engaged in with Trione. In those six reports, the only reference to flood reimbursement appeared in the June 2, 1977 report of Hurst's interview of May 31, 1977 with Trione, which stated:

Trione advised that at one time when FEARN could not pay his rent, FEARN advised him that he would pay his rent in full when he would get his flood insurance check. He advised that he did not realize that FEARN had applied for some flood damage and he did not realize that FEARN was going to receive some money from an insurance company.

This statement not only speaks of payment of flood insurance by an insurance company instead of a loan or grant by the federal government, but, more importantly,

is completely silent as to any confession, admission, or acknowledgment of guilt by the defendant. The trial court then permitted the defendant to examine Hurst under oath outside the presence of the jury. Satisfied that the government had first learned two days earlier that Trione was going to testify regarding the defendant's admission and that the government possessed no written statements or confessions, the court denied the mistrial motion.

The defendant then called Hurst as a witness before the jury. Hurst testified categorically and emphatically that during six conversations which he held with Trione on November 4 and December 13, 1976, and, February 9, May 31, July 26 and August 10, 1977, Trione never mentioned that the defendant had admitted guilt to him. Hurst also said that he had informed Trione at the times of the interviews that the purpose of the interviews was related to false statements to obtain flood loans. Hurst further testified that he was in the presence of the prosecutor and Trione two days earlier but did not hear Trione tell the prosecutor about defendant's admission.

The defendant testified that he absolutely never had any conversation with Trione wherein he made any statement of any sort to him that the defendant's claim was not a legitimate and proper claim. Trione testified that he eventually sued the defendant for back rent and when pressed as to why he had not told Hurst about the defendant's admission during the pre-trial interviews, said: "I figured it was my word against his, you know; I didn't think it was important at all."

After the jury retired to deliberate the foreman sent a note to the Judge asking: "Are we to have a copy of FBI reports from agent Hurst for evidence?" The judge responded: "Agent Hurst's written FBI reports were not admitted into evidence and therefore cannot be given to you." Thereafter the jury returned its verdict finding the defendant guilty on all three counts.

### III

At the close of the government's case, the defendant filed a motion for judgment of acquittal, one ground relying on Trione's testimony as to defendant's admission of guilt. During Trione's testimony, the defendant objected to the portion relating to defendant's acknowledgment of guilt and as noted above asked for a mistrial. Before the defendant put on his case, the trial court denied both motions.

The defendant raised two issues on appeal arising out of Trione's testimony as to the defendant's extrajudicial admission: (1) whether the court erred in failing to grant a mistrial for the government's failure to advise the defendant of a confession; and (2) whether the court erred in not directing a verdict of acquittal because the conviction rests upon an extrajudicial statement of defendant with no independent evidence of the *corpus delicti.*

Although a different view is taken in some of the circuits,[1] the Seventh Circuit has expressly held that the oral statements of prospective government witnesses, incorporating oral statements of defendant in the nature of confessions, admissions or acknowledgments of guilt, made to the witness, are precluded by the Jencks Act, 18 U.S.C. § 3500, from pre-trial discovery under Fed.R.Crim.P. 16. *United States v. Callahan*, 534 F.2d 763 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

The denial of the mistrial was correct. Therefore, we are required to consider the defendant's motion for judgment of acquittal.

### IV

The defendant's motion for a judgment of acquittal is tested in the Seventh Circuit by the standard of whether substantial evidence, taken in the light most favorable to the government, *Glasser v. United States*,

---

1. *See, for example, United States v. Lewis*, 167 U.S.App.D.C. 232, 511 F.2d 798 (1975) and cases cited therein at 802–03.

315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), tends to show that the defendant is guilty beyond a reasonable doubt. *United States v. Williams*, 311 F.2d 721, 723 (7th Cir. 1963).[2] In the Fifth Circuit a slightly more precise, but equivalent, test has been developed. There the test of the sufficiency of proof on a motion for judgment of acquittal or review of the denial of such a motion, is whether the jury might reasonably conclude that the evidence is inconsistent with the hypothesis of the defendant's innocence. *United States v. Lonsdale*, 577 F.2d 923, 925 (5th Cir. 1978).[3] Another way of expressing the same rule is that the motion for judgment of acquittal must be granted when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to the defendant's guilt, *United States v. Herberman*, 583 F.2d 222 (5th Cir. 1978), and is such that a reasonably-minded jury *must* have a reasonable doubt as to the defendant's guilt. *United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1973).

■ Under Fed.R.Crim.P. 29(a), the court "shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction . . . ." At the close of all the evidence, the defendant renewed his motion for judgment of acquittal, which the court denied after the jury had brought in its guilty verdict. Under these circumstances, where the defendant did not stand on his motion for acquittal, but introduced evidence in defense, in determining the sufficiency of the evidence, the court of appeals can examine the evidence as a whole, including that offered by the defendant. *United States v. Wetzel*, 514 F.2d 175, 177 (8th Cir.), *cert. denied*, 423 U.S. 844, 96 S.Ct. 80, 46 L.Ed.2d 65 (1975).

**V**

■ It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused. *Wong Sun v. United States*, 371 U.S. 471, 488–89, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Bukowski*, 435 F.2d 1094, 1105 (7th Cir. 1970), *cert. denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971). "In our country the doubt persists that zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession." *Opper v. United States*, 348 U.S. 84, 89–90, 75 S.Ct. 158, 162, 99 L.Ed. 101 (1954). The *Opper* court added:

> The need for corroboration extends beyond complete and conscious admission of guilt—a strict confession. . . . [S]tatements of the accused out of court that show essential elements of the crime . . . necessary to supplement an otherwise inadequate basis for a verdict of conviction . . . have the same possibilities for error as confessions. They, too, must be corroborated.

> \*     \*     \*     \*     \*     \*

> Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination.

*Id.* at 91, 90, 75 S.Ct. at 163, 162.

The requirement of corroboration does not affect the competence or admissibility of the admission, but necessitates a determination of whether the remaining evi-

---

2. In *United States v. Yeoman-Henderson, Inc.*, 193 F.2d 867, 869 (7th Cir. 1952), we quoted with approval the following from *Curley v. United States*, 81 U.S.App.D.C. 389, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947):

   The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of

the jury to determine credibility, weigh evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

3. The interesting development of this standard is chronicled in *United States v. Haggins*, 545 F.2d 1009, 1011–13 (5th Cir. 1977), which demonstrates that the rule, although more detailed, is equivalent to the Seventh Circuit rule.

dence *aliunde* the admission is sufficient to sustain the conviction. *United States v. Bukowski, supra*, at 1105–06, note 7. In the ordinary criminal case, the corroboration must consist of proof that a crime was committed, that is, proof of the *corpus delicti*.[4] This case falls in the slightly different category established in *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), where the court said at 153–54, 75 S.Ct. at 198:

> The first issue is whether the requirement of corroboration may properly be applied to the crime of tax evasion. The corroboration rule, at its inception, served an extremely limited function. In order to convict of serious crimes of violence, then capital offenses, independent proof was required that *someone* had indeed inflicted the violence, the so-called *corpus delicti*. Once the existence of the crime was established, however, the guilt of the accused could be based on his own otherwise uncorroborated confession. But in a crime such as tax evasion there is no tangible injury which can be isolated as a *corpus delicti*. As to this crime, it cannot be shown that the crime has been committed without identifying the accused. Thus we are faced with the choice either of applying the corroboration rule to this offense and according the accused even greater protection than the rule affords to a defendant in a homicide prosecution, *Evans v. United States*, 122 F.2d 461; *Murray v. United States*, 53 App.D.C. 119, 288 F. 1008, or of finding the rule wholly inapplicable because of the nature of the offense, stripping the accused of this guarantee altogether. We choose to apply the rule, with its broader guarantee, to crimes in which there is no tangible *corpus delicti*, where the corroborative evidence must implicate the accused in order to show that a crime has been committed. *See, e. g., Tabor v. United States*, 152 F.2d 254; *United States v. Kertess*, 139 F.2d 923; *Ercoli v. United States*, 76 U.S.App.D.C. 360, 131 F.2d 354;

*Pines v. United States*, 123 F.2d 825; *Forte v. United States*, 68 App.D.C. 111, 94 F.2d 236; *Tingle v. United States*, 38 F.2d 573; *Wynkoop v. United States*, 22 F.2d 799; *Daeche v. United States*, 250 F. 566.

■ As in the *Smith* case, in the present case there is no tangible *corpus delicti* and the corroborative evidence must implicate the accused in order to show that a crime has been committed. The narrow question here is whether the flooding conditions caused damage to the defendant's personal property. The fact that these same conditions damaged the property of 2300 other persons in the county eliminates the hypothesis that there was no flood in the area or that there were no flooding conditions sufficient to cause damage. At the John DeShields—John Robinson apartment complex, located two miles from the defendant's apartment and, like it, built on concrete slab without basements, 78 tenants suffered flood losses and obtained disaster loans.

Here we have a landlord whose tenant (the defendant) owed back rent which he was required to sue for (the potential "maliciousness of an enemy") and who "recalled" at the trial an admission which he did not mention in six interviews with a government agent although he was told the government was investigating false statements, as to which the alleged admission would be obviously pertinent.

We hold that the testimony of the admission is not sufficient to sustain the conviction unless there is sufficient corroboration in the other evidence adduced at the trial.

## VI

The government's burden was to prove beyond a reasonable doubt that the defendant did not suffer property damage on April 22, 1973, due to water entering his apartment.

---

4. *See* Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession*, 103 U. of Pa.L.Rev. 638 (1955); *Developments in the Law—Confessions*, 79 Harv.L.Rev. 935, 1072–84 (1966); 7 Wigmore, Evidence § 2071 (Chadbourn rev. 1978); Annot. 45 A.L.R.2d 1316 (1956).

As a practical matter it is never easy to prove a negative. *Elkins v. United States*, 364 U.S. 206, 218, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). In some states evidence tending to establish a negative fact is either inadmissible (*see, e. g., Banko v. Continental Motors Corp.*, 373 F.2d 314, 316 (4th Cir. 1966): "The general Virginia rule is that evidence regarding absence of other injuries under similar circumstances is not admissible to show that a defendant in a negligence case met the required standard of care") or entitled to lesser weight (see, e. g., S. Gard, Illinois Evidence Manual, 654 (1963): "Affirmative testimony as to a fact is entitled to greater weight than negative testimony as to the same fact").

■ The current federal rule is that "[a]ll relevant evidence is admissible" (Fed.R. Evid. 402), and relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.[5]

■ The defendant testified on his own behalf as to the flood damage and the procedure he followed with the SBA in obtaining the disaster loan. His testimony in that regard was substantiated by the records of SBA introduced by the government, and by the testimony of the loss verifier and loan specialist for the SBA, both of whom testified for the government. This evidence is summarized in Part I of this opinion.

In addition, the defendant testified that he lived in Apartment 6 at 612 North 41st Street from 1968 until 1974 under several landlords, Trione being the most recent. Trione testified that he was the contract purchaser of an apartment complex located at 612 to 624 North 41st Street, containing 19 ground level apartments built on a concrete slab over gumbo. The structure containing the defendant's apartment included five adjoining ground-level apartments (apartments 6 through 10) and across a small courtyard was a similar structure with five more adjoining ground-level apartments (apartments 1 through 5). Nearby were nine other similar apartments.

Trione testified that during the Spring of 1973, due to the high water table and a shifting of the gumbo underneath the buildings, his complex experienced some foundation cracking, brick cracking, and a separation between windows and their frames and between doors and their frames. Both landlord and the tenant-defendant testified that Apartment 6 was rented with bare tile floors for which the defendant supplied his own rugs and carpeting, and that during the defendant's tenancy he made all of his own repairs, never calling on Trione even when it was necessary to replace the toilet commode. The defendant testified that in order for him to put down his own carpeting, it was necessary to remove an "extension" on the bottom of the front door so that the door would open and shut over the pile of the carpeting, leaving a space of two to two and one-half inches between the threshold and the bottom of the door. No evidence tended in any way to deny these facts or to rule out the possibility that outside water could enter the ground level apartment either through the bottom of the front door or as a result of backed-up storm sewers.

The only thrust of the testimony given by several witnesses called on behalf of the government—Trione, the building assistant manager, the building maintenance man, and fee owner of the building—was that they were not aware that the ·defendant had suffered personal property damage and he made no complaints to them. The defendant related how it was necessary to clean up the water immediately and what steps he took to do so. There was no need or purpose in telling the landlord or his

---

5. The corroboration rule encompasses negative facts. *Developments in the Law—Confessions*, 79 Harv.L.Rev. 935, 1073 (1966):

    The independent evidence requirement may even force the prosecution to establish a negative fact. . . . The courts have required evidence of a negative fact even when procuring such evidence was extremely difficult; for instance, in a prosecution for falsely reporting a crime, the state was required to introduce independent evidence that the reputed crime had not occurred.

agents after the clean-up that some of defendant's own property had been damaged.

One of the landlord's agents (the building manager) was of no help to the government inasmuch as he assumed his position many months after Easter Sunday of 1973, but he strengthened the defendant's case by testifying that one of Trione's adjoining buildings suffered a "big gap in it" due to the Spring 1973 flooding, causing water and bugs to come into the apartments. Also the maintenance man testified that there was extensive structural damage to one of Trione's buildings as a result of the Spring 1973 flooding, and the assistant manager acknowledged that during heavy rainfalls the water backed up in her own apartment in the Trione complex.

The next group of witnesses consisted of nearby neighbors of the defendant. The defendant called the tenant of apartment 5, a counterpart of apartment 6 but in a separate building about 25 feet away across the courtyard from the defendant's apartment. Tenant five testified that as a result of the heavy rain on April 22, 1973, his apartment flooded, damaging shoes and rugs, and that he saw the defendant's water-soaked carpeting and clothing stored in cardboard boxes. He also testified that at that time water stood one and one-half feet deep in the alley adjoining his apartment. At the trial, the defendant had introduced several photographs showing high watermarks of several inches on the wall of the laundry room which was next to apartment 6. Tenant five testified that his apartment was also next to a laundry room, which makes it significant that both such apartments flooded on April 22, 1973. Tenant five made no disaster loan claim.

The tenant in apartment 7, immediately adjoining defendant's apartment, testified that on Easter Sunday, 1973, her apartment flooded due to the foot of water outside the door, damaging rugs and tables in the amount of $250–300. Tenant seven said that the water from the outside came up over the edge of the foundation slab and flooded her apartment and also the laundry room. She started to file a disaster loan claim but it became too difficult to make several trips downtown. Tenant seven's husband also testified, stating that the water backed into their apartment through the front door and that they gave up on the loan because it "got very bureaucratic."

In opposition to the testimony of the flooding of apartments 5, 6 and 7 on April 22, 1973, the government introduced subsequent tenants of 5 and 6 and of apartment 10, all of whom testified that there were no floods in 1974 or 1975. Tenants of apartments 3, 4, and 10 during April 22, 1973, testified that they suffered no flooding in their apartments, but tenant ten conceded that water often stood in the adjoining alley during rainfalls at least as high as the foundation. Tenants three and four said that they did not use the alley adjoining the complex, where many of the other tenants testified high water often stood during rainstorms.

The only other neighbor witness called by the government resided at 659 North 41st Street and said she had no flood damage. In support of the defendant, the parties introduced by stipulation a computerized printout of disaster loans approved in St. Clair County during the 1973 disaster declaration, which listed the some 2300 persons receiving loans, the location of each loss, and the amounts of the original loans received as reflected in the original loan files maintained by the SBA. This list showed two loans granted in the same block as the defendant, nine more granted about one block away, 13 more granted about two blocks away and another loan about two and one-half blocks away, for a total of 25 flood-related disaster loans granted within two and one-half blocks of the defendant's apartment.

The defendant also called as a witness on his own behalf the Director of the East St. Louis Housing Authority, the defendant's supervisor, who corroborated the defendant's whereabouts on April 21–23, 1973, and the massive rainfall on Saturday night and Easter Sunday. He testified that he went to defendant's apartment about ten days later where he saw that there was a water-

mark on the wall about two and one-half inches high, that the rugs were gone, and that he smelled an odor. Two mothers and members of the tenant advisory board of the Housing Authority testified that a few days after Easter Sunday of 1973, they picked up four or five boxes of wet clothing which the defendant donated to them; that the clothes were wet, mildewed and smelly and included ten pairs of pants, twelve shirts and ten jerseys.

Finally, the owner of a construction company at 640 North 42nd Street, testified that he saw two feet of water accumulate behind the apartment complex as he worked all day Easter Sunday 1973 to try to grade the area with his construction equipment to drain off the water. He said it rained hard all day and that he may have inadvertently created a dam in the area causing water to leave one area and enter another, contributing to the two feet of water behind the apartments.

The last group of witnesses on behalf of the government consisted of various government employees. A photograpmetrist and a cartographer for the Defense Mapping Agency established that 612 North 41st Street, where the defendant had resided, was located in a depression contour which was about four and one-half feet below nearby State Street, located to the south. The land around the apartment building sloped toward the building from the east, south, and west, causing all precipitation in the immediate area to flow into the alley adjoining the building and then in a westerly direction past the front door of the defendant and the other tenants in that building.

The cartographer examined a set of aerial photographs taken on April 28, 1973 and could see no water problems in the area of defendant's apartment on that day. Several of the other neighbor witnesses had testified to massive rain storms on Saturday and Easter Sunday, April 21–22, 1973, which was, of course, a week earlier than the time of the aerial photographs.

A service hydrologist with the National Weather Service testified that the high water condition in the area in April, 1973 was due to very heavy and repeated rainfall and an extraordinary volume of water moving down river from points upstream. This caused a high water table in the East St. Louis area and made rain surface drainage more difficult. The rainfall in April itself was 4.25 inches or about one-half inch more than normal. The rainfall on April 22, 1973, was 1.08 inches at Lambert-St. Louis International Airport, which is 25–30 miles away from East St. Louis. The prosecution attempted to impeach each witness who testified as to the heavy rainfall on April 22 in the area of defendant's apartment by using the one-inch rainfall figure from 25–30 miles away, which the hydrologist speculated was not enough to cause a flash flood. Judicial notice can be taken that a spring rainfall measured at that distance has very little, if any, relation to the amount or velocity of the rainfall at the crucial point—the defendant's residence.

A hydrologic technician for the Corps of Engineers established that the Mississippi River at St. Louis is 379.74 feet above sea level, that flood stage is 30 feet higher than that, and that on April 28, 1973, the river reached its highest recorded level of over 13 feet higher than flood stage. On April 22, the river was almost six feet above flood stage.

The government called two final witnesses intending to show what sewer conditions were at the critical time and place. The Superintendent of the East St. Louis Sewer Department testified that during the Spring of 1973, there were sewer problems "all over the town," but he could not recollect any on 41st Street. However, he conceded that he had consulted no records and obviously could not remember what actually happened on April 22.

A supervisory civil engineer for the Corps of Engineers testified that he had done emergency sewer repair work in East St. Louis because the high river elevation in 1973 made the water table rise and caused sewer breaks. He testified that there were some breaks east of 41st Street and one west of 41st Street during the time he worked there.

None of the evidence beyond the extrajudicial admission in any way tended to prove that the defendant did not suffer personal property damage due to water entering his apartment on Easter Sunday, April 22, 1973.

The jury was confronted with 21 government witnesses and nine defense witnesses. Much of the evidence offered by the government employee witnesses was technical, dull and repetitive. The only directly pertinent testimony in the entire governmental case was Trione's sudden bombshell that defendant told him "there was no damage" and "everybody's getting it [government money]." During the closing argument the prosecutor elaborated on the few words of admission testified to by Trione. He said:

> I want you to remember the statement that was made by Mr. Fearn as related by Mr. Trione: "No, there was no damage here, but everybody else was going down to get some, so I better get on the gravy train, too. I better go down and get on that Federal gravy train—on your taxpayer's dollars—and go down there and get myself some of that money to which I'm not entitled."

The jury's note to the judge reflected the importance to the jury of the admission. The judge's reply, although it was about all that the judge could say, also prejudiced the defendant by leading the jury to believe that the FBI reports could not be considered by them.

The jury, starting with the presumption of the defendant's innocence, could not reasonably conclude that the evidence was inconsistent with the hypothesis of innocence and must have entertained a reasonable doubt that any crime had been committed. The evidence, viewed in the light most favorable to the government, is so scant *aliunde* the admission that the jury could only speculate as to the defendant's guilt. There was no substantial, or even slight

evidence, other than the admission, taken in the light most favorable to the government, which tended to show that the defendant was guilty beyond a reasonable doubt.

The conviction is reversed.

REVERSED.

BAUER, Circuit Judge, concurring.

I concur in the opinion of Judge Sprecher for the reason therein stated: the evidence of the existence of a crime, absent the statement of the witness Trione concerning the defendant's "admissions", is non-existent.

Having said that, however, I have a fear that the opinion might be misconstrued to hold that evidence of a *corpus delicti*—an injury *and* a criminal agency responsible for such injury—must *always* be proved independently of the confession. Such is not the law.

The *corpus delicti* need not be established by evidence completely independent of the confession. If there is corroborating evidence which tends to confirm the circumstances related in the confession, both may be considered in determining whether the *corpus delicti* is sufficiently proved.[1]

In *Smith v. United States, supra,* cited in the opinion of Judge Sprecher, Mr. Justice Clark, writing for the Court, stated: "All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Id.* at 156, 75 S.Ct. at 199.

Nothing in this record bolsters the confession/admission and the *corpus delicti* remains unproved. I concur in the reversal.

---

1. One obvious situation in which this rule is particularly important would occur when a body is discovered under circumstances indicating foul play but after the body has so badly decomposed that proof of the *cause* of death cannot be established by evidence independent of a confession corroborated in various respects. An example of such a case is found in *People v. Melquist,* 26 Ill.2d 22, 185 N.E.2d 825 (1962).