**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Raymond KANE and Robert A. Scott,
Defendants-Appellants.**

**Nos. 82–2971, 83–1970.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 17, 1983.

Decided Jan. 27, 1984.

Frank C. Furci, Miami, Fla., for defendants-appellants.

James Schweitzer, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and DUMBAULD, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This story of narcotics peddling involves defendants traveling between Canada and the United States who are a little more sophisticated than defendants in the ordinary local narcotics case, but the issues are not. Defendant Kane questions the admission of evidence relating to his character and prior crimes, and the admission of certain prior statements he made to an undercover agent without his counsel being present. Defendant Scott questions the sufficiency of the evidence and joins in Kane's objection to the same evidence of

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

Kane's prior statements to an undercover agent because of its impact on his own defense.[1] We affirm.

Kane and Scott, along with Robert Kellar and Gerard Madden, were charged on April 19, 1982 in a two count indictment with conspiring to possess with intent to distribute cocaine and to distribute cocaine in violation of 21 U.S.C. § 846 (Count I), and with distributing and causing to be distributed approximately one kilogram of cocaine in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (Count II). Kellar and Madden pleaded guilty and are not involved in this appeal. A jury found Kane and Scott guilty on both counts.[2]

## I.

### The Facts

Since sufficiency of the evidence is questioned, we summarize the facts in some detail. The story began in January 1982 in Toronto, Canada when Kellar inquired of Constable MacAulay, an undercover drug investigator for the Royal Canadian Mounted Police, whether he was interested in obtaining some "coke." The constable responded that he was, if it was of good quality. Kellar suggested that the constable meet with "the people." "The people," Kellar said, were not interested in an initial test sale of a few ounces, but would deal only in "keys," or 2.2 pounds of substance. Several weeks later the constable met Kellar again. Kellar advised the constable that his source was located near Chicago's O'Hare Airport. The minimum quantity "the people" would bother with was one pound for $40,000. Later, in a series of meetings and calls, the constable and Kellar worked out the details for a meeting to complete the transaction in March in two Chicago hotels. There was also a third hotel involved, but it was used only by undercover agents.

Upon his arrival in Chicago, the constable met with federal Drug Enforcement Administration (DEA) agents at the O'Hare Hilton Hotel to plan the snare. One agent assumed the role of a courier for the narcotics, and another the role of a moneyman. They left the O'Hare Hilton with the constable for the defendants' hotels. Upon arrival, the constable contacted Kellar, who informed him that he had been unable to contact his man, but agreed to go look for him since the constable was ready to do business.

DEA agents followed Kellar from the hotel to a residence. Kellar eventually emerged from that residence with Scott, and the two of them drove off. They stopped at two restaurants and then returned to one of their hotels. Kellar got out, and Scott drove alone to a store, came out with a grocery bag, and drove away.

Meanwhile, back at their hotel, Kellar gave the constable the news that he had met with his people and that "all is well." Kellar and the constable then left for the second of the defendants' hotels, where they met with the "moneyman" and the "courier" to check the money. Then it was back to the other hotel again for the constable and Kellar, accompanied by the courier. There in the parking lot Scott reappears, and Kane, wearing a white trench coat, appears on the scene for the first time. Kane removed a gym bag from the trunk of the car in which he had arrived, entered the hotel, and registered under an alias using a false address from Atlanta, Georgia. Kane lived in Miami, Florida.

In the hotel, Scott and Madden met Kellar in his room and then went down to the hotel lobby. All the defendants, Kane,

---

1. Defendant Scott waived oral argument. We decide his claims based on the briefs he submitted.

2. Kane was fined $25,000 and sentenced to a twelve year term of imprisonment on both counts, the sentences to run concurrently. In addition, a ten year special parole was imposed on Count II.

Scott was sentenced on Count II to a two year term, fined $5,000 and given a special parole term of eight years. On Count I, Scott was sentenced for a term of five years, which was suspended, and was placed on probation for a period of five years to run consecutively to the term of imprisonment imposed under Count II.

Madden, Kellar, and Scott, met and conversed for a few minutes in the lobby. When that meeting broke up, Kellar and Scott went to the room occupied by the constable and the courier to work out further transaction details. Kellar and Scott told the constable the "stuff" was already in the hotel. A little later, Kane, Madden, Kellar, and Scott gathered together again in one of the hotel rooms. In a few minutes, Kane, Madden, and Scott stepped into the hall. Kane was still wearing his white trench coat, which he demonstrated was not one you could ordinarily find at a local shopping center, as there were numerous special pockets sewn into the inside lining. Kane traded coats with Madden. Madden went alone in his borrowed coat to the other hotel and began to count the cash, $80,000, with the moneyman.

Kellar and Scott, who had remained, were just outside the door, but Scott left and returned carrying an ice bucket. He entered the room, dumped out the ice and produced the cocaine. It was tested for quality. The constable said he was satisfied and would advise the moneyman at the other hotel, where Madden had gone, to pay the price. Other agents then entered the room and arrested Scott and Kellar. A short time later, back at the other hotel, Madden stuffed the $80,000 in the numerous inside pockets of the white trench coat. In showing off the coat to the constable, Kane explained that they were all professionals and would be happy to do business with them in the future. Perhaps Madden has now changed his mind about that. He was promptly arrested by a different type of professional waiting just outside the room. The money was retrieved from the many pockets. Meanwhile, Kane had returned to the lobby of the other hotel where he was the last to be arrested. All four defendants were then transported to the federal building and the three-hotel narcotics escapade came to a close.

The defendants were given the *Miranda* warnings and processed. Kane was put in a holding room. Agent Sack went to the holding room after Kane indicated he wanted to call his wife. The agent asked Kane how he was doing. Kane's response was: "By now you have checked me out and you know I am pretty big." Kane went on to say that he had been in business for a long time and was now concerned about the safety of himself and his family. In addition, he discussed his connections with Colombians and Cubans, which arose because as a mechanic he repaired their boats. For the most part, Kane was telling the agent nothing new. Evidence was offered at trial by another undercover agent who testified that in a 1980 conversation with Kane in Miami, Florida, Kane had talked about his cocaine business and his ability to supply large quantities. The admission of both conversations is disputed in this appeal.

## II.

### Kane's Issues

A. Kane's first objection is to the admission of his 1980 conversation with the undercover agent in Florida. He argues that the conversation was used to show his cocaine dealing past and to attack his character in violation of Rule 404(a), Fed.R.Evid. Rule 404(a), with certain exceptions not applicable here, prohibits the admission of evidence of a person's character or a trait of character for the purpose of proving that the person acted in conformity therewith on a particular occasion. Kane also argues that the admission of the Miami evidence was contrary to Rule 403, Fed.R.Evid., which excludes evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

The government supports the admission of the evidence as other crimes evidence admissible under Rule 404(b),[3] claiming that it satisfies the test applied in this

---

3. Rule 404(b), Fed.R.Evid. provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

circuit. The government and Kane have no substantial disagreement about what that test is. Kane cites *United States v. Adderly,* 529 F.2d 1178, 1180 (5th Cir.1976), which generally tracks the rule applied in this circuit. Other crimes evidence is admissible if: (1) the prior act is similar enough and close enough in time to be relevant, (2) the evidence is clear and convincing, (3) the probative value of the evidence outweighs its risk of prejudice, and (4) the evidence is needed to prove an essential element of the charged offense. *United States v. Wormick,* 709 F.2d 454 (7th Cir.1983).

The possible relevance of a prior narcotics conviction to show knowledge and intent in a subsequent narcotics case involving the same defendant cannot be disputed, *see United States v. Juarez,* 561 F.2d 65, 73 (7th Cir.1977), nor can the similarity of the acts. Nor can the nineteen months difference in time between Kane's original Miami conduct and the crime charged here render the Miami evidence too remote in time to be relevant. This court has held that five years between the prior acts and the indictment need not disqualify the evidence as being too stale. *United States v. Zeidman,* 540 F.2d 314, 319 (7th Cir.1976). The principal concern is in the balancing of the probative value of the evidence with its prejudice to the defendant.

■ Kane's knowledge and intent to commit the charged offenses were critical issues, and disputed by Kane. The government needed the disputed evidence to prove Kane's knowledge and intent. Other crimes evidence need not be the only evidence the government has on a contested issue in order for the evidence to be admissible. When weighed with other available evidence, if the evidence is reasonably necessary to meet the government's burden of proof beyond a reasonable doubt, then the evidence meets the fourth part of the admissibility test. *United States v. Dolliole,* 597 F.2d 102, 106 (7th Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979).

■ The factual story revealed evidence of Kane's involvement in the cocaine deal, but the story lacked direct evidence that Kane was the actual supplier of the cocaine. There was no accomplice testimony, and there was no statement to an undercover agent, for instance, which reflected Kane's knowledge or intent. In the balancing process, the government should not necessarily be prevented from introducing evidence of other crimes under Rule 404(b) simply because the government's case would not be subject to a motion for judgment of acquittal without it. The government is entitled to make as strong a case as possible to carry its burden of proof, subject to the court's discretion in balancing the necessity of the other crimes evidence to the government with its undue prejudice to the defendant.

The reliability of Kane's Miami statements is also a balancing factor. Kane himself made the admissions directly to the testifying witness, a government agent. The evidence was satisfactorily clear and convincing. *Dolliole,* 597 F.2d at 106–07. We find that the trial judge exercised his discretion carefully and properly, and that there was no error in the admission of the Miami evidence. *United States v. Serlin,* 707 F.2d 953, 959 (7th Cir.1983). The admission was also carefully guarded with cautionary instructions to the jury.

B. Kane also claims error because certain statements he made to Agent Sack after his arrest in this case were admitted over his objection. It is his position that after being advised of his *Miranda* rights, he did not waive the right to remain silent, and was duped by the agent into making the admissions. He also argues, alternatively, that he did not give the statements voluntarily and, therefore, his fifth amendment rights were violated. Neither claim has merit.

■ If Kane, upon reflection, now believes he talked too much, he is to blame, not the agents. On the way from the hotel to the federal building, Kane was given the *Miranda* warnings; he indicated he understood them and that he did not wish to make a statement. At the federal building, Kane was routinely processed as a new ar-

restee and gave some personal history about himself, but was asked nothing about the current charges, and gave no information about them. A *Miranda* interrogation violation does not occur when arresting officers question a defendant only to a limited extent for data required as part of the processing normally attendant to arrest and custody. *Cf. Rhode Island v. Innis,* 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). No fault can be found with the routine arrest processing that occurred in this case.

During processing, Kane asked to use a telephone to call his wife. The processing agent advised Kane he could make the call as soon as his booking was complete. After the processing, Kane was returned to his holding cell. Agent Sack, in order to arrange for Kane's requested telephone call, went to the holding room. It was then that Kane initiated the conversation and volunteered the comments about which he now complains. He was discriminating in his comments, however, as he said he did not want to talk at that time about the identity of his source. Kane was no neophyte in these matters. He had two prior controlled substance convictions in which he had been represented by counsel and had been advised not to talk to police officers. There was no requirement for Agent Sack to re-administer the *Miranda* warnings when he was only there to arrange for Kane to make the telephone call that Kane had requested, and not to interrogate him.

What Kane volunteered was not in response to interrogation in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Not only was there no express interrogation, there were no other words or actions on the part of the agents that the agents should have known would be reasonably likely to elicit an incriminating response from Kane. *Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. at 1689. *See also United States v. Garza,* 664 F.2d 135, 143 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982).

Nor can Kane turn the events surrounding the phone call episode into police coercion. An agent's single comment during that conversation that "only you can help yourself," made after Kane had stated he did not want to go to jail, did not change the character or environment of the conversation between the agent and Kane. There was no pressure of any kind applied to Kane. He admitted he was politely treated. When Kane decided he had voluntarily talked enough, he quit, and the agents did nothing to persuade him to continue.

### III.
#### Scott's Issues

A. Scott first questions the sufficiency of the evidence. The thrust of his argument is that the evidence failed to prove the existence of any narcotics conspiracy to which Scott was a party. The conspiracy, a simple one in spite of the number of countries, hotels, defendants, and agents who got involved, was to act together to arrange and conclude the cocaine sale to the constable. All defendants, working as a team, made some contribution to that effort, as is obvious from the factual summary. *See United States v. Mancillas,* 580 F.2d 1301, 1307–08 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978); *United States v. Holmes,* 452 F.2d 249, 255–56 (7th Cir.1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479, 407 U.S. 909, 92 S.Ct. 2433, 32 L.Ed.2d 683 (1972).

Conspirators are not always involved in the actual illegal transactions. For instance, a conspirator may be across the street acting as a lookout. The proof of involvement under those circumstances may be more difficult for the government. But Scott was no mere lookout. He was there from start to finish. Several times he met with the other defendants when the actual sale was being arranged at the hotels. Scott, in a conversation with the constable, attested to the high quality of their merchandise. They were, he said, looking forward to a continued business relationship with the constable. The circumstances strongly suggest that Scott transported the

**350**

cocaine from one hotel room to another in an ice bucket. After dumping the ice, Scott carried the cocaine into the room for the constable to inspect. Scott was even a witness to the exchange between Kane and Madden of the white trench coat when the many inside pockets were demonstrated. It is clear that Scott knowingly participated in and attempted to contribute to the success of their illegal joint venture. *See United States v. Cardi,* 478 F.2d 1362, 1368 (7th Cir.), *cert. denied,* 414 U.S. 852, 94 S.Ct. 147, 38 L.Ed.2d 101, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973).

■ B. Scott joins in Kane's objection to the Miami conversation evidence, which was admitted as to Kane only. We have already found it to be admissible against Kane. The impact that that evidence might have against Scott is a consideration to be weighed by the trial judge. *United States v. Alpern,* 564 F.2d 755, 760 (7th Cir.1977).

■ The Miami evidence did not directly involve Scott, although Kane had said he had people working for him who were paid to take the risks. No names or descriptions were included. The trial court instructed the jury when the evidence was first admitted, and again during Scott's closing argument, the government's rebuttal, and at the close of the trial, that they were to consider the Miami evidence only in relation to Kane, and only for limited purposes even against Kane. The prosecutor in closing argument made a comment about Kane and the Miami evidence which was followed by a short comment about both Kane and Scott. Scott tries to make something out of the prosecutor's comment to show that Scott was put under the cloud of Kane's past, but Scott was neither put under that cloud by the evidence itself nor by the prosecutor's innocuous comment. The evidence was not so inflammatory or prejudicial that there was a danger the jury would

ignore the court's instructions that the evidence did not apply to Scott.

We find no error in the trial. The jury's verdict of guilty deserves to stand. The convictions of Kane and Scott are affirmed.