UNITED STATES of America,
Plaintiff-Appellee,

v.

Peter BASILE, Defendant-Appellant.

No. 84–2439.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1985.

Decided Aug. 26, 1985.

As Amended Sept. 3, 1985.

Maury S. Epner, Crim. Div., Washington, D.C., for plaintiff-appellee.

Mary Mikva, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and WRIGHT, Senior Circuit Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This is a mail fraud case in which defendant Peter Basile, the owner of a Datsun 280–ZX automobile in need of substantial repair, arranged for its disappearance and destruction so as to permit him to collect for his "stolen" car from his insurance company. This alternative way of disposing of unwanted automobiles instead of selling them for what they were worth seems to have been preferred by Basile. This time, however, he was found guilty in a jury trial of two counts of mail fraud in violation of 18 U.S.C. § 1341.[1]

There are two issues: first, whether the evidence, resting to a large extent on Basile's own unsuspecting admissions, was sufficient to support the mail fraud convictions; and second, whether the district court abused its discretion by admitting Basile's same unsuspecting admissions of prior similar crimes under Fed.R.Evid. 404(b) for the limited purpose of establish-

---

* The Honorable Eugene A. Wright, Senior Circuit Judge of the Ninth Circuit, is sitting by designation.

1. Basile was acquitted on similar charges involving an Oldsmobile.

ing Basile's intent to defraud his insurance company.

### Facts

There is no dispute but that the 1979 Datsun 280–ZX disappeared forever in 1981, Basile maintaining it was stolen, but the government claiming that Basile arranged for a junkyard friend to put it in the "cruncher" so he could collect more for it than he could sell it for.

In July, 1979, Basile purchased the Datsun new for $15,000 by borrowing from a Chicago bank, the loan to be repaid at the rate of $250 per month. Basile was not too faithful with his loan payments which caused the bank to initiate repossession, but that was not accomplished. In the sixteen months following purchase and before it disappeared Basile used the car extensively. In 1980 he pulled a loaded trailer with it from Tucson to Chicago. On this haul the car developed an ominous loud humming and grinding noise in the rear, but the Datsun kept running. Later its already damaged bumper got knocked off. A few repairs would not suffice and adequate repairs were estimated to cost about $2,000. Basile summed up his car's condition by saying it was "shot." However, when Basile reported to his insurance company that the Datsun had been stolen, he represented that his Datsun did not have a dent or a scratch on it. His insurance company paid off Basile's bank car loan in the amount of $9,437.60, plus an additional check for $527.40 to Basile's wife in whose name the car was insured. The insurance company's payment included $120 for silk shirts Basile claimed were in the Datsun, but it is doubtful that the silk shirts were also sent to the cruncher. Also included in the $527.40 check was $300 for the rental of a substitute car. Basile, by this "theft," thereby avoided being indebted to the bank for a car likely not worth what was owed on it.

Basile has had great difficulty keeping the quality cars he prefers. Between January, 1976 and June, 1979, a Cadillac and a Jaguar were also "stolen" at the expense of his insurance companies, as was an Olds-

mobile, but we will say that it just disappeared as the jury acquitted him on the Oldsmobile counts. In 1976 he reported to his insurance company the "theft" of his 1973 Cadillac. As a result his insurance company paid $4,767 on the car's lien, $300 to the dealership for temporary auto rental, and $482 to Basile. Shortly thereafter Basile purchased a 1974 Jaguar for $7,389. About a year later this car was "stolen" so his insurance company paid the lien holder $4,947 and Basile $3,852. That insurance company noticed the unusual difficulty Basile was having keeping his cars so the company decided to discontinue his auto insurance. Later Basile purchased the 1978 Oldsmobile Regency for $8,800, but after it was damaged and the interior had deteriorated Basile decided it was time to have it disappear, and of course it did. From a restaurant parking lot he told his new insurance company it was stolen, and a fine car it was. This time from his insurance company his car lender collected $6,683 and Basile $1,367. Within a month he bought the Datsun 280–ZX which is the subject of this appeal.

### Analysis

Much of the detail in the preceding account comes from the controversial evidence of Basile's surreptitiously recorded conversations with his "friend" Sal Romano, who unbeknown to Basile did some paid undercover work for the FBI. Some of the conversations were recorded before the Datsun was "stolen," and some after.

Basile claims those taped conversations constitute the only evidence of fraud the government presented and are uncorroborated. Therefore, it is argued the evidence *aliunde* Basile's own statements is not sufficient since there is no tangible *corpus delicti* to show a crime was actually committed. Basile relies on *United States v. Fearn*, 589 F.2d 1316 (7th Cir. 1978). Before we analyze *Fearn* we must review just a few pertinent portions extracted from the tapes; setting forth the

complete tapes would not aid Basile's defense.[2]

In February, 1981, prior to the theft of the Datsun, Romano recorded a conversation with Basile, and one other person, about Basile's successful experiences in this type of transaction and his plans for his present Datsun.

ROMANO: What about did, ah, you talk to Carl about your car?

BASILE: Yeah. I'll take it over by Mikey.

ROMANO: Mike?

BASILE: That guy we saw downtown in by Dean Wolfson coming out and I asked you if you knew that guy Mike ... remember, we were there that day.

ROMANO: Swiatek?

BASILE: Swiatek, yeah. Ya know Mike's got a junkyard.

ROMANO: Oh, yeah, I didn't know that.

BASILE: Yeah, he took my other last couple of cars.

ROMANO: Oh, no kidding? You gotta pay him or is it, ah....

BASILE: No, no, he just takes the car, strips it down or whatever ... makes money off the parts, whatever they do on it. I don't know, ya know ... but it's gone. Ya know what, I mean, that's the most important thing.

ROMANO: Yeah. Well, ain't no sense in grabbing a bumper for it then.

BASILE: No, I'm gonna give, I'm gonna put it in the _____ cruncher, _____ it.

. . . .

BASILE: If some guy got his car stolen, how does Allstate pay? I know one of them is bad ... it's either Allstate or State Farm ... one of them are dirty _____ _____.

DEVOS: Right.

BASILE: I don't wanna get _____ up with the car ... especially me ... I've done four _____ cars already.

DEVOS: Who you got? Allstate?

BASILE: Allstate.

ROMANO: Why don't you stash the car for awhile, then throw it in the crusher after you get paid ...

Then after the Datsun had been "stolen," that is stripped and crunched, there were additional taped conversations which confirm that Basile's earlier expressed intent had been accomplished. Here are a few of the comments:

ROMANO: Who'd you give it to, Wease?

BASILE: That kid that owns the pizza joint?

ROMANO: Oh, that kid Donny?

BASILE: Yeah, that kid Don.

ROMANO: (Inaudible) was he, you said he was in the car business anyway, huh?

BASILE: He's got a little _____ lot, like, you know, he's got some beaters over there.

LEHNING: Yeah, but why, how did he dispose of, ah, ah ...

BASILE: (Inaudible) beaters over there (inaudible).

LEHNING: Ah, how did he dispose of the rest of it, the stuff with all the numbers and _____ on it, you know?

BASILE: That what?

LEHNING: How did he dispose of the frame and all the rest of it?

BASILE: I don't know.

LEHNING: Must ah cut it up. With a torch probably. (Inaudible).

ROMANO: What'd ya have, Allstate Insurance?

BASILE: Allstate, yeah.

ROMANO: Any (sic) they're the worst, too.

. . . .

LEHNING: What the _____, you drove it long enough, right?

BASILE: _____, I drove it for two years. And all I did was make payments, _____, the car was _____ shot. I need $2,000 in cash just to get the car fixed.

LEHNING: Especially when that guy ripped the bumper off.

---

**2.** In his conversations Basile seems to have a very difficult time expressing himself without the use of certain obscenities, but even with those obscenities omitted his comments are adequate for our purposes.

BASILE: Yeah, ripped the bumper off, the ____ ____, it's a score for me. It was a headache. Yeah.

ROMANO: Yeah, that guy probably took the stereo out, he probably took ...

BASILE: New battery, $100 I paid for it.

....

ROMANO: Did you junk, you burn five cars (inaudible), you crunch five cars Wease?

BASILE: Five cars.

ROMANO: And they didn't give you no smoke?

BASILE: No smoke, did every car I ever had.

LEHNING: You told 'em that boat was stolen one time, and the ____ ____ like to hit the ____ ceiling. What?

BASILE: I did my Jag ...

ROMANO: Did your Jag ...

BASILE: Did my Jag for $15,000. Remember Bones?

DEVOS: You must've made out on that one.

BASILE: Ah, but I only paid $7,000.

LEHNING: And how much did you get?

BASILE: $15,000.

LEHNING: Oh my god.

BASILE: Cash.

DEVOS: Huh? Great.

BASILE: (Inaudible) Chicago Motor Club. Best club in the world.

LEHNING: You ain't _____.

BASILE: I did the Olds (inaudible) my '98 Olds.

DEVOS: Joy had that for ____, twenty years. I burned that ____ ____.

ROMANO: You put that in the cruncher, didn't ya?

BASILE: Yeah, the Olds I put in the cruncher. Mikey Swiatek did it.

BASILE: Go to jail if they knew I did it, that's for sure.

Basile was quite correct in this last comment since he received a one-year sentence for the Datsun to be served consecutively with other sentences imposed by other courts.

■ To be added to Basile's own incriminating admissions is the confirming evidence of his Datsun ownership, its poor state of repair, some difficulties in making the car payments, the Datsun's disappearance, and finally the insurance company payments. Viewing the evidence, at this stage, in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence is sufficient.

Our decision in *Fearn* does not require a different conclusion. That case holds that a conviction must rest upon firmer ground than merely the uncorroborated admission of the accused. That conviction was reversed because it rested only on the extrajudicial statement of the defendant with no independent evidence of the *corpus delicti*. In *Fearn* the defendant's alleged admissions were testified to by the defendant's landlord, Trione, to whom he owed rent, but the landlord in six previous FBI interviews before trial had never mentioned the defendant's alleged admissions. *See id.* at 1320. The landlord's testimony about the admissions was found not to be sufficient to sustain the conviction as corroborating evidence was nonexistent. Not only was there a lack of corroborating evidence, however, but there was in fact substantial evidence contrary to the government's position. *Id.* at 1323–26. In concurring in *Fearn*, Judge Bauer clarified the holding, and his is the rule we apply in this case.

I concur in the opinion of Judge Sprecher for the reason therein stated: the evidence of the existence of a crime, absent the statement of the witness Trione concerning the defendant's "admissions", is non-existent.

Having said that, however, I have a fear that the opinion might be misconstrued to hold that evidence of a *corpus delicti* —an injury *and* a criminal agency responsible for such injury—must *always* be proved independently of the confession. Such is not the law.

The *corpus delicti* need not be established by evidence completely independent of the confession. If there is corroborating evidence which tends to con-

firm the circumstances related in the confession, both may be considered in determining whether the *corpus delicti* is sufficiently proved.

*Fearn,* 589 F.2d at 1326 (footnote omitted).

In the present case Basile told what he was going to do with his car and afterwards he said he had done it that way. He is very convincing on the tapes. This evidence was not from Basile's landlord, but was Basile himself, taped, and heard by a jury. It is clear that Basile thought he had a tried-and-true way to defraud. The mails were used in furtherance of his scheme so that the money could be distributed by his insurance company for Basile's uses. Altogether the tapes and the corroborating evidence about the Datsun were sufficient to prove the *corpus delicti* and support the conviction.[3]

■ The remaining issue concerns whether the district judge abused his discretion under Fed.R.Evid. 404(b) in admitting evidence as to the similar fate which befell the Cadillac and Jaguar (the Oldsmobile was the subject of separate counts) for the limited purpose of establishing Basile's intent to defraud.

Those other two "thefts" were similar enough (almost identical) and close enough in time (within about five years) to be relevant to the Datsun "theft." The evidence of the other "thefts" was sufficiently clear and convincing (Basile's friends appear to have been convinced by Basile's own words at the time). *United States v. Kane,* 726 F.2d 344, 348 (7th Cir.1984). In his account of his past successful "thefts," Basile misstated the name of one insurance company and the exact amount of recovery, but considering the various cars and insurance companies these minor discrepancies can be forgiven. The probative value of the evidence was needed to convict and outweighed its risk of prejudice to Basile. Finally, the evidence was needed to prove an essential element of mail fraud, Basile's intent to defraud. *United States v. Kane,* 726 F.2d at 348. Evidence of prior acts is particularly appropriate where criminal intent as in mail fraud is an essential element of the crime. *United States v. Hutul,* 416 F.2d 607, 624 (7th Cir.1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

The trial judge sufficiently weighed the "other crimes" issue on the defendant's pretrial motion *in limine* and again during trial. When Basile's defense sought in part to portray Basile as the unwitting victim of a domineering friend, the judge, seeing the need and doing the balancing, admitted the evidence of the other car "thefts," but limited it strictly to the element of intent to defraud, and the jury was so instructed. *United States v. Miller,* 573 F.2d 388, 393–94 (7th Cir.1978).

The government may be obligated to Basile for his own conviction due to his taped candid comments to his friends, but there is no reversible error.

AFFIRMED.

---

**3.** As we find from all the facts and circumstances that there was sufficient corroboration to justify use of Basile's admissions in establishing the *corpus delicti,* we need not decide whether the pre-crime or post-crime admissions would be sufficient by themselves without corroboration. On that issue see the following cases cited by the government relying on *Warszower v. United States,* 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941); *United States v. Pennell,* 737 F.2d 521, 537 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Soulard,* 730 F.2d 1292, 1298 (9th Cir.1984); *United States v. Doyle,* 234 F.2d 788, 794 (7th Cir.), *cert. denied,* 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87 (1956); and *United States v. Potson,* 171 F.2d 495, 499 (7th Cir.1948). The defendant, however, takes issue with the government about these cases, but we need not resolve that dispute.