**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Cleveland R. RODGERS,**
**Defendant-Appellant.**

**No. 84–1279.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1984.

Decided Feb. 1, 1985.

Mervyn Hamburg, Washington, D.C., for plaintiff-appellee.

Michael P. Seng, Edward B. Arnolds, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, and POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Cleveland Rodgers was convicted following a jury trial on three counts of violating federal drug laws in connection with a scheme to distribute cocaine to an undercover government agent. On appeal, Rodgers alleges ten separate errors as bases for reversing his convictions. Although some of Rodgers's arguments present difficult questions, we find no reversible error, and therefore affirm the convictions.

## I. FACTS

The prosecution of Cleveland Rodgers represents "one part of a large Government investigation into alleged narcotics dealings." Tr. at 14. A central figure in this investigation conducted by the Drug Enforcement Administration ("D.E.A.") is Michael Skeans, an informant who began cooperating with the government after he was arrested on drug charges in February 1983. Skeans introduced Rodgers to Raleigh Lopez, an undercover special agent for the D.E.A., and thereby set in motion the events leading to this prosecution. We summarize these events assuming, as we must, that the jury viewed the evidence in a light most favorable to the government. *See United States v. Kaminski*, 703 F.2d 1004, 1005 (7th Cir.1983).

Beginning in February 1983, Lopez and Skeans made a series of five telephone calls from Chicago to Rodgers in the Bahamas, Rodgers's home and place of citizenship. During these tape recorded conversations, Lopez, using the undercover name "Gary," acted as a friend of Skeans's who sought to purchase from Rodgers a large quantity (two kilograms) of cocaine. Much of the discussion apparently focused on Lopez's attempts to persuade Rodgers to travel and deliver the cocaine to Chicago personally, and Rodgers's demand that Lopez make a cash deposit before delivery. The last of these recorded calls occurred on May 25, 1983.

On August 16, 1983, Lopez and Skeans, along with law enforcement officers Pamela Laco and Thomas DeCanter, traveled to the O'Hare Hilton Hotel outside Chicago. Lopez, Skeans, and Laco proceeded to a hotel room where they met Patrice Tynes, a woman whom Skeans knew and who identified herself as Rodgers's fiancée. Upon request, Tynes produced from her purse a tinfoil package containing a small sample— later determined to weigh about 9/10 gram— of white powder containing cocaine. Lopez and Laco then escorted Tynes to the hotel lobby, where DeCanter was waiting with a bag containing $20,000 cash. DeCanter showed Tynes the money, and Tynes then returned to the hotel room with Lopez and Laco. Back in the room, Tynes telephoned Rodgers in the Bahamas and told him that she had seen the cash. Lopez also spoke on the phone, and Rodgers tried to persuade him to give the money to Tynes as a deposit. Lopez refused, again insisting that Rodgers travel to Chicago personally in order to receive payment.

Finally, on the morning of August 28, 1983, Lopez received a call from Skeans notifying him of Rodgers's arrival at O'Hare International Airport. Accompanied by officers Laco and Guadelupe Rodriguez, Lopez and Skeans drove to the airport, where they met Rodgers in the terminal. Rodgers told Lopez and Skeans that his source had a kilo of cocaine ready for delivery (although Rodgers himself had none in his possession), and that he wanted to collect the $20,000 from them and fly back to the Bahamas that day. Lopez then introduced Rodriguez to Rodgers as a friend who owned a currency exchange in downtown Chicago, and said that the $20,-000 would have to be picked up there. Rodgers thus got into Lopez's car along with Skeans and the other officers, and Lopez began driving downtown.

While enroute, Rodgers had a conversation with Lopez in which he made a number of incriminating statements. Rodgers asked Lopez about the quality of the cocaine sample that had been delivered by Tynes, whom Rodgers said was now his wife. When Lopez complained that the quality wasn't that good, Rodgers said that the kilo to be delivered would be of superior quality. Further, in response to Lopez's questioning about how many kilos of cocaine were available for sale, Rodgers said that he and his associates used to have 100 kilos, but only 49 were left. Rodgers ultimately said that he would sell Lopez 10 kilos of cocaine every two weeks. Finally, Rodgers described his involvement in a number of previous cocaine transactions, along with his 1981 arrest on drug charges in Chicago. Rodgers said that after the 1981 arrest, he gave a fictitious name

("Yaamme Neefie"), posted bond, and fled to the Bahamas.

The car ride ended in front of the federal building in downtown Chicago, where Lopez told Rodgers that he was under arrest. According to Lopez, Rodgers replied: "I should have known." Tr. at 173. While in custody, Rodgers signed a waiver of rights form and gave a handwritten statement confessing that he had arrived in Chicago on August 28, 1983, "to meet my friend, Michael Skeans, to receive a deposit of $20,000 to initiate the purchase of one kilogram of cocaine." Id. at 187. In this statement, Rodgers also admitted that "[o]n August 16th I sent my fiance to meet with Michael Skeans and collect $20,000 for me," but claimed that Tynes "was not familiar with the arrangements, and an associate … planted a sample on her without her knowledge." Id. at 187–88. Finally, Rodgers's statement named several persons as sources of cocaine in the Bahamas.

Based on the information and events described above, a grand jury returned an eleven-count indictment against Rodgers and Tynes. The majority of these counts were dismissed either before or during trial, however, leaving only three counts which actually went to the jury: Count I, for conspiring with Tynes to distribute, or to possess with intent to distribute, cocaine in violation of 21 U.S.C. § 841(a)(1) (1982); Count II, for actual distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) (1982); and Count III, for use of a telephone in causing or facilitating the commission of a conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 843(b) (1982).

The government's evidence at trial consisted primarily of Rodgers's written statement, testimony by Lopez and the other officers invovled in the case, testimony by Skeans describing the particular events relating to the indictment as well as Rodgers's involvement in previous cocaine trans-

actions, and the tape recordings and transcripts of the five phone conversations between Rodgers, Skeans, and Lopez. Rodgers's counsel, by his cross-examination of government witnesses and by his jury instruction on the defense's theory of the case, suggested that Rodgers's real intent was not actually to sell cocaine to Lopez, but simply to abscond to the Bahamas with the $20,000. Nevertheless, Rodgers did not testify himself, nor did he call any other witnesses in his defense. After an approximately three-day trial, the jury convicted Rodgers on all three counts. Judge Aspen sentenced him to six years imprisonment followed by a twenty-year special parole term on Count II, and to five years probation on each of Counts I and III. The five years probation on Counts I and III were set to run concurrently, but consecutive to the sentence imposed on Count II.

■■■ Rodgers now presents ten bases for reversing his convictions. For purposes of brevity and clarity, however, these alleged errors by the district court can best be discussed in four sections: 1) denial of Rodgers's motion for a continuance, 2) denial of his motion to dismiss Count III based on the alleged unconstitutionality of section 843(b) and the insufficiency of the evidence,[1] 3) adverse rulings on several evidentiary issues, and 4) refusal to give several jury instructions submitted by the defense. We will discuss each of these points in turn.

## II. DENIAL OF A CONTINUANCE

As a result of circumstances beyond his control, the defendant was represented at trial by an attorney who had been appointed by the court approximately two days before jury selection began, and four days before the actual trial commenced. Rodgers's contention that the district court committed reversible error by denying his counsel's motion for a continuance in this

---

1. Because the sentences imposed on Counts I and III are concurrent, and Rodgers does not directly challenge the conviction on Count I, the government invites us to apply the concurrent sentence doctrine and thus not review the con-

viction on Count III. Since we cannot rule out the possibility of collateral effects resulting from the Count III conviction, however, we decline to invoke the discretionary concurrent sentence doctrine in this case.

situation is perhaps the most serious issue on appeal because of its potential overarching effect on the fairness of the trial as a whole.

An attorney from the Federal Defender's office was appointed by the court to represent the defendant shortly after his arrest. This attorney filed a number of pre-trial motions, and completed most of the preparation for trial, which was ultimately set for Friday, December 2, 1983. On Wednesday, November 30, 1983, however, the Federal Defender's office received Jencks Act files from the government which revealed that the government planned to call as a witness against Rodgers a person whom the office represented as a client. The defendant's attorney therefore moved that very day to withdraw from the case, and Judge Aspen searched the list of private attorneys on the Federal Defender panel for a replacement. Judge Aspen telephoned the first attorney on the alphabetical list, Edward Arnolds, and asked whether he could represent the defendant, explaining that the trial would begin that week. Arnolds accepted the appointment.

Nevertheless, when he appeared in court on Friday afternoon—when jury selection was set to begin—Arnolds moved orally for a continuance. He rested the motion on two grounds: first, that he was generally not adequately prepared for trial,[2] and, second, that he needed additional time to interview important witnesses, particularly Patrice Tynes.[3] Although there is no indication in the record that the government opposed the motion, the district court denied it. As to Arnolds's general preparation for trial, the court reasoned that the case was not complex, that opening statements and the introduction of evidence in the case would not begin until the next Monday, and that Arnolds knew of the circumstances when he accepted the appointment. With

regard to the interviewing of Tynes or other witnesses, the court noted that Rodgers's prior counsel had agreed to the trial date long before the possible conflict was discovered two days earlier, and had not requested any continuance for interviewing witnesses or other purposes. "It seems to me," Judge Aspen explained, "as far as that particular ground, you stand in the shoes of prior counsel." Tr. at 5.

The court then gave Arnolds the opportunity to withdraw, but informed him that if he did so the court would simply find another attorney to try the case—on Monday, as planned. Under these circumstances, and after consulting with the defendant, Arnolds agreed to continue representing Rodgers. The defendant now argues that the denial of his motion for continuance made the provision of counsel "little more than a precondition for conviction."

■ Because of the broad-ranging, almost standardless discretion that a trial court must exercise in scheduling trials, the grant or denial of a continuance is subject to appellate review only for an abuse of discretion. *Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) ("broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel") (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)); *United States v. Davis,* 604 F.2d 474, 480 (7th Cir.1979). Moreover, in order to establish this abuse of discretion, a party normally must make some showing of actual prejudice resulting from the trial court's ruling. *See United States v. Aviles,* 623 F.2d 1192, 1196 (7th Cir.1980); *United States v. Miller,* 573

---

**2.** For example, Arnolds said that he had not received the case file from the Federal Defender's office until the previous afternoon (Thursday), and thus he still had not finished reading it as of Friday.

**3.** Arnolds told the court that he coincidentally would be traveling to the Bahamas in January,

and had received approval from Tynes's attorney to interview her there. Further, Arnolds explained that the defendant had told him that there were about twelve witnesses whom he considered it important to subpoena and interview.

**540**

F.2d 388, 395 (7th Cir.1978). *See also United States v. Jimenez-Diaz*, 659 F.2d 562, 567 (5th Cir.1981), *cert. denied*, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982).

■ A defendant appealing from the denial of a continuance in a criminal case typically will claim prejudice in the form of ineffective assistance of counsel. *See, e.g., United States v. Cronic*, — U.S. —, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Morris v. Slappy*, 103 S.Ct. at 1610; *United States v. Phillips*, 640 F.2d 87 (7th Cir.), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981). In evaluating such a claim, an appellate court generally must inquire into counsel's actual performance at trial. *See United States v. Cronic*, 104 S.Ct. at 2047–48; *Strickland v. Washington*, — U.S. —, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). In rare cases, however, the refusal to allow counsel additional time to prepare might occur in circumstances so egregious that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *See Cronic*, 104 S.Ct. at 2047. In essence, the denial of a continuance can sometimes be tantamount to the denial of counsel. Thus, the thresh-

old question for us is whether this is one of those cases.

■ While we hesitate to state affirmatively that the court below exercised its discretion wisely or prudently by denying the continuance under the circumstances,[4] we do not find these circumstances so horrendous as to raise a presumption of prejudice to the defendant. Given the fact that the case had already been prepared by previous counsel, Arnolds's primary tasks were to read and familiarize himself with the case file, and to prepare notes for trial. The case itself was not so complicated that counsel required a great amount of time or expert assistance to understand the pertinent issues. In sum, although preparation time of only two days for jury selection and two more days for the beginning of the trial in this case can hardly be characterized as extensive, it is not so restrictive that we must assume unfairness without considering whether there was actual prejudice.

■ Shifting our analysis to the question of actual prejudice, we have little trouble concluding from a review of the record that the denial of the continuance had no significant adverse impact on counsel's performance at trial.[5] On the first day of the

4. Although a trial court must weigh all the factors in deciding how to rule on a continuance motion—and interests of efficiency will often militate against allowing delay—the court should give particularly careful consideration to such a motion when it comes from the counsel for a criminal defendant who was appointed just before trial. The interest in ensuring the defendant a fair, adversarial proceeding assumes great significance in criminal cases, so the normal reluctance of a trial judge to grant continuances should give way when there is a significant potential that counsel's performance will be adversely affected. *Cf. United States v. King*, 664 F.2d 1171, 1173 (10th Cir.1981) ("Although rulings on motions for continuance are best left to the trial court's discretion, a judge is not imbued with the power to abrogate a criminal defendant's constitutional rights."). Further, in evaluating whether or how much additional time to give a defendant's counsel for preparation, the court should factor in time for preparing for voir dire and jury selection, particularly where, as here, the defendant himself may not be taking the stand.

5. The cases cited by the defendant are easily distinguishable because there was a clear showing of prejudice resulting from the denial of the continuance in each of them. *See United States v. Wirsing*, 719 F.2d 859, 864–66 (6th Cir.1983) (abuse of discretion to deny continuance where "substantial prejudice" resulted because attorney therefore had no time to prepare a defense to a complex tax evasion charge); *Alford v. United States*, 709 F.2d 418, 425 (5th Cir.1983) (denial of continuance an abuse of discretion where counsel was forced to withdraw for lack of preparation and defendants were forced to appear pro se at a hearing on their petitions to vacate their sentences and withdraw guilty pleas); *United States v. Ploeger*, 428 F.2d 1204 (6th Cir.1970) (abuse of discretion to deny continuance where trial date set ten days after return of indictment, and counsel had not yet been able to prepare or interview witnesses); *Everitt v. United States*, 281 F.2d 429, 435–36 (5th Cir.1960) (reversing denial of continuance where counsel appointed only one day before trial and defendant therefore deprived of Sixth Amendment right to assistance of counsel).

actual trial, Arnolds made a series of detailed objections to evidence that the government had given notice of its intent to use, including a motion to suppress the statements that Rodgers had made after his arrest.[6] Throughout the trial, Arnolds represented the defendant professionally and zealously, making relevant and timely objections to government questioning on direct, and conducting incisive cross-examination of government witnesses. The present case is much like *United States v. Phillips*, 640 F.2d at 92, wherein this circuit rejected an ineffective assistance of counsel claim based on the denial of a continuance. What we said in *Phillips* applies equally here: "Our examination of the record satisfies us that trial counsel's performance more than met minimum professional standards." *Id. See also United States v. Miller*, 573 F.2d 388, 395 (7th Cir.1978).

We are thus left with Rodgers's contention that denial of the continuance prejudiced him by denying him the opportunity to subpoena and interview potential witnesses, such as Patrice Tynes. The Fifth Circuit has adopted a useful general test for evaluating such claims:

> A movant [for a continuance] must show that due diligence has been exercised to obtain the attendance of the witness, that substantial favorable evidence would be tendered by the witness, that the witness is available and willing to testify, and that the denial of a continuance would materially prejudice the defendant.

*United States v. Miller*, 513 F.2d 791, 793 (5th Cir.1975). *Accord United States v. Alvarez*, 591 F.2d 10, 11 (5th Cir.1979); *United States v. Uptain*, 531 F.2d 1281, 1287 (5th Cir.1976). The strict requirements of this test reflect the fact that a defendant could otherwise delay trial almost indefinitely on the speculation that

some distant witness might provide favorable evidence.

In response to Rodgers's argument, we need only note that he has made no showing whatsoever that Tynes or the other witnesses to which he alludes would offer any favorable testimony, let alone "substantial favorable testimony." Although a defendant may not be required to file a specific description of what a witness will say before he or she is interviewed, the defendant must give some indication that favorable evidence will actually be forthcoming in order to establish prejudice. In the present case, as in *United States v. Rothman*, 567 F.2d 744, 749 (7th Cir.1977), where this circuit found no abuse of discretion in the denial of a continuance, "[n]o specific evidence is suggested that would have been offered had there been more time, only that there might have been something." *Id.*

In sum, we find no actual prejudice to Rodgers resulting from the denial of the continuance, and thus no abuse of discretion requiring reversal on this basis.

## III. THE CONVICTION ON COUNT III

Count III charged Rodgers with the use of a telephone in facilitating the commission of a conspiracy to distribute cocaine in violation of 21 U.S.C. § 843(b), based on Tynes's phone call to the defendant in the Bahamas from the O'Hare Hilton on August 16, 1983. The defendant contends that the district court should have dismissed this count either because section 843(b) is unconstitutionally overbroad or vague, or because the evidence was insufficient to establish a statutory violation. We find both contentions to be without merit.

### A. Overbreadth and Vagueness

Section 843(b) provides in pertinent part:

---

Moreover, in reviewing rulings on continuances, "[r]eported decisions offer little guidance; each decision necessarily turns on the particular facts and circumstances of the case." *United States v. Davis,* 604 F.2d 474, 480 (7th Cir.1979).

**6.** In fact, the trial court conducted a hearing on this motion to suppress, during which time Arnolds performed impressively both in cross-examining government witnesses and in bringing out Rodgers's version of the events on direct.

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter.[7]

The defendant initially attacks this statute as facially overbroad, claiming that First Amendment protected speech comes within its prohibitions. His claim rests on the premise that the phrase "knowingly or intentionally," the scienter requirement of the statute, merely modifies "use of any communication facility," and not "causing or facilitating the commission" of a felony. Thus, the defendant raises the spectre of criminal prosecutions against persons who intentionally use a communication facility (such as a telephone) to engage in protected speech when that use fortuitously causes or facilitates a violation of the federal drug laws, notwithstanding the person's lack of any intent or knowledge that such a violation would occur.[8]

■■■■ The defendant assumes a heavy burden in challenging section 843(b) as facially overbroad, for it is now well-established that such a challenge can succeed "only when the statute is substantially overbroad, i.e., when the statute is unconstitutional in a substantial portion of the cases to which it applies." Regan v. Time, Inc., —— U.S. ——, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487 (1984). Accord New York v.

Ferber, 458 U.S. 747, 749, 102 S.Ct. 3348, 3350, 73 L.Ed.2d 1113 (1982); Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). In determining whether a statute is overbroad in this sense, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494 n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982).[9] Ultimately, however, even a statute that appears overbroad because of its ambiguity should not be struck down if it is subject to a reasonable limiting construction. See New York v. Ferber, 458 U.S. at 769 n. 24, 102 S.Ct. at 3361 n. 24; Broadrick v. Oklahoma, 413 U.S. at 613, 93 S.Ct. at 2916.

■■■■ Construing section 843(b) in light of the facial ambiguity concerning its scienter requirement, the defendant makes a persuasive argument that the statute might reach a substantial amount of protected speech. We need not reach this issue, however, since we conclude that section 843(b) can and should be interpreted to require that the causing or facilitation of a felony itself be knowing or intentional. Indeed, courts that have previously applied the statute, albeit without discussing the particular issue, seem to have assumed that section 843(b) carries such a requirement. See, e.g., United States v. Barnes, 681 F.2d 717, 724 (11th Cir.1982) ("The

7. The statute further provides:
Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.
21 U.S.C. § 843(b).

8. A few of the examples that defendant offers to prove this point include the following: "reading Carlos Castaneda causes someone to possess a controlled substance with intent to distribute; an educational TV chemistry class facilitates the manufacture of a controlled substance; a district court opinion causes a law student to buy some cocaine."

9. Therefore, as the Court observed, "the vagueness of a law affects overbreadth analysis." Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494 n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982). See also Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983); Baer v. City of Wauwatosa, 716 F.2d 1117, 1125 (7th Cir.1983) ("a statute need not be vague to be overbroad, but its vagueness could make it overbroad").

Rodgers's claim that the statute is void for vagueness, considered later in this section, is nevertheless analytically distinct from the overbreadth claim, for an enactment can be unduly vague irrespective of whether it reaches constitutionally protected conduct. See Village of Hoffman Estates, 455 U.S. at 494–95, 102 S.Ct. at 1191–92.

question is ... whether [the defendant's] call ... was knowingly or intentionally made for the purpose of facilitating the conspiracy."), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983); *United States v. Phillips,* 664 F.2d 971, 1032 (5th Cir.1981) ("There was thus a sufficient showing that [the defendant's] conversation ... had the unlawful purpose of facilitating the commission of the illegal possession with intent to distribute....."), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Jones,* 612 F.2d 453, 457 (9th Cir.1979) (upholding sufficiency of evidence showing that the defendant instructed third party "to make the calls in order to protect his narcotics from government confiscation, and in this manner to facilitate the distribution of heroin. The proscribed purpose was established."), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Turner,* 528 F.2d 143, 165 (9th Cir.1975) (rejecting appellants' argument that jury instruction "permitted the jury to convict them without finding the requisite intent, *i.e.,* without actually finding that ... they knowingly and intentionally facilitated a conspiracy by the use of the telephone.").

This interpretation finds further support in the fact that when Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970, the language of section 843(b) was changed over that of its predecessor statute, which was codified at 18 U.S.C. § 1403(a), to add the "knowingly and intentionally" requirement. *See United States v. Pierorazio,* 578 F.2d 48, 50 (3d Cir.) (generally comparing old and new sections), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 652 (1978). While there is nothing in the legislative history that spe-

cifically reveals the purpose of this change, we find it hard to believe that Congress would have taken the trouble to add a scienter requirement merely to exclude liability for the inadvertent use of a communication facility. The more persuasive explanation is that Congress meant to require the causing or facilitation of the crime to be knowing or intentional.

Thus construed, section 843(b) is no longer subject to attack as facially overbroad. The defendant does argue that even this interpretation of the statute allows it to sweep some protected speech within its ambit; for example, he states that section 843(b) as so construed would still "make it unlawful to appear on television for the purpose of advocating the use of cocaine." Defendant may be correct in saying that the literal language of the statute could be interpreted to embrace some protected speech, but this does not suffice to overturn a statute. There is no substantial overbreadth. *See also United States v. Cerone,* 452 F.2d 274, 286 (7th Cir.1971) (discussing relevance of purpose of speech to whether that speech is protected), *cert. denied,* 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972).

Defendant also attacks section 843(b) as void-for-vagueness both on its face and as applied. In particular, he urges that the statute is vague both as to the means by which the crime of using a communication facility is established,[10] and as to the intent necessary to prove a violation. The void-for-vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited [and] in a manner that does not encourage arbitrary and discrimi-

---

**10.** Rodgers contends that the statute is facially vague in this sense based on the definition of "communication facility" as including "all other means of communication," and the fact that the statute does not specify that the facility must be used for communication (so, he argues, "hiding a controlled substance in the back of a pocket radio" might be a violation).

Further, he claims that the statute is vague as applied to him because of uncertainty as to

whether "use" includes the receipt as well as the placing of a telephone call. As explained in our discussion below of Rodgers's liability on Count III, this case does not implicate the issue of whether receipt of a call constitutes use by the *principal,* since Rodgers was prosecuted on a theory of vicarious liability for Tynes's violation of the statute.

natory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). As with overbreadth, a party seeking to overturn a statute for vagueness on its face must in essence establish that it is unconstitutionally vague in at least a substantial number of the cases to which it could apply. *See Levas & Levas v. Village of Antioch*, 684 F.2d 446, 451 (7th Cir.1982) ("a finding of unconstitutional vagueness cannot be based on uncertainty at the margins, or on a parade of bizarre hypothetical cases: problems of that order can be resolved in challenges to the ordinance as applied."). *See also Kolender v. Lawson*, 103 S.Ct. at 1859 n. 8; *Village of Hoffman Estates*, 455 U.S. at 494–95, 102 S.Ct. at 1191–92. Furthermore, it is a commonplace that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193. *See also United States v. Bohonus*, 628 F.2d 1167, 1173–75 (9th Cir.) (rejecting vagueness challenge to mail fraud statute), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980).

■ To state the governing law on this issue is to reject the defendant's vagueness attack on section 843(b). The statute is simply not so vague as to create a meaningful danger of arbitrary law enforcement, and any problems with the notice it provides (which we think are in any event minimal) are alleviated by the intent requirement. Section 843(b) is no more, and possibly less, vague than other broadly-phrased federal criminal statutes that we have consistently upheld over vagueness and overbreadth challenges. *See, e.g., United States v. Feinberg*, 535 F.2d 1004, 1010 (7th Cir.) (mail fraud statute), *cert. denied*, 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 (1976); *United States v. Dellinger*, 472 F.2d 340, 354–64 (7th Cir.1972) (Anti-Riot Act), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *United States v. Cerone*, 452 F.2d 274, 286 (7th Cir.1971) (Travel Act). We reach the same conclusion here.

## B. Sufficiency of Evidence

■ Rodgers was originally indicted on six counts of violating section 843(b). The first five counts charged the defendant alone with violating the statute based on his conversations with Lopez and Skeans, while the last count (Count III of the final indictment) charged both the defendant and Tynes with violating the statute based on Tynes's phoning him from Chicago. Prior to trial, the defendant moved to dismiss all six counts, arguing that his receipt of telephone calls in the Bahamas could not establish his "use" of a communication facility in Illinois. In a memorandum opinion, the district court granted his motion to dismiss as to the first five counts, but denied it as to the other count.

The district court reasoned that the first five counts should be dismissed because Congress did not intend section 843(b) to cover the mere receipt of a phone call by a defendant in a foreign country from a federal agent in the United States, or alternatively because venue on such an offense is not proper in the United States. Despite its disagreement with this analysis, the government does not cross-appeal the dismissal of these counts.[11] The court nevertheless declined to dismiss the remaining count, not on the theory that Rodgers could be liable as a principal for his receipt of Tynes's call while he was in the Bahamas, but rather that he could be held vicariously liable for *Tynes's* placing of the call from Chicago.[12] The government's theory at tri-

---

**11.** Relying on *United States v. Cordero*, 668 F.2d 32, 43 n. 16 (1st Cir.1981), the government takes the position that the term "use" includes the receipt of a telephone call. We do not reach this issue, however, because the dismissal of the other counts is not on appeal, and because the conviction on Count III is affirmed on other grounds.

**12.** The district court specifically found that the defendant could be convicted based on Tynes's placing of the call because, as a co-conspirator of Tynes's, he would be liable for her overt acts

al was that Rodgers was guilty of "causing" Tynes to place the August 16 call from Chicago.

The defendant argues on appeal that the court below should have dismissed Count III for the same reasons it dismissed the other counts. Since all of the counts involved the defendant's receipt of calls in the Bahamas, and since the only apparent difference concerned the person who placed the calls—Agent Lopez or Tynes—the defendant contends that the district court's analysis of section 843(b) required dismissal of all the counts. This line of argument completely misses the mark. While Rodgers's reasoning might carry if the question as to Count III was whether he could be principally liable for receiving a call in the Bahamas,[13] it is irrelevant to the government's charge that he caused or directed Tynes to call him from Chicago in order to facilitate the conspiracy to sell cocaine to Lopez.

The jury clearly could convict Rodgers if it believed the government's theory. *See United States v. Jones,* 612 F.2d 453, 457 (9th Cir.1979) ("Instructing another to use the telephone for the proscribed purpose amounts to a 'use' by the instructor."), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). The defendant does not specifically challenge the sufficiency of the evidence to show that he caused Tynes to place the call, and the jury was properly instructed on that theory. We therefore affirm the defendant's conviction on Count III.

## IV. EVIDENTIARY ISSUES

Three primary evidentiary rulings of the court below are before this court on appeal:[14] 1) admission of the statements Rodgers made after his arrest, 2) admission of prior bad acts testimony charging the defendant with possession of cocaine, and 3) sustaining of the government's objections to defense counsel's cross-examination concerning Skeans's potential liability for felony murder. None of these rulings constitute reversible error.

### A. Rodgers's Statements

The defendant moved before trial to suppress all written and oral statements that he made after his arrest. In support of this motion, Rodgers testified at a pre-trial hearing that the agents induced him to make the statements by promising, *inter alia,* that if he cooperated he would be charged only with a minor offense and would be released to live with Skeans as a government informant, and that Tynes would not be prosecuted at all. Further, the defendant stated that he was coerced into making the statements by the threat that he would not be allowed to cooperate and obtain these benefits if he exercised his right to counsel. Rodgers alleged that this latter threat was expressed orally by Agent Lopez, and in writing by virtue of a

---

done in furtherance of the conspiracy. *See United States v. Shelton,* 669 F.2d 446, 454 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *United States v. Read,* 658 F.2d 1225, 1230 (7th Cir.1981). The jury was also instructed at trial on co-conspirator liability. Although the jury could have convicted Rodgers on this theory also, we limit our focus to the theory that the government adopted at trial, discussed below.

**13.** Even this much is not certain, however, as one of the major concerns of the district court—the potential for United States law enforcement officials to create crimes by phoning persons abroad—would not arise when the relevant call was placed by someone other than an officer, such as a co-conspirator.

**14.** The defendant also contends that the district court committed reversible error by denying his

motion in limine to prevent the government from using an eight-year-old Bahamian armed robbery conviction to impeach him should he testify. The United States Supreme Court has since decided *Luce v. United States,* —— U.S. ——, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), wherein it held "that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* 105 S.Ct. at 464. Since Rodgers did not testify, *Luce* today would foreclose us from reviewing such a contention. Even assuming *arguendo* that *Luce* does not apply so as to bar our review of the district court's ruling, we find no abuse of discretion requiring reversal. *See Lenard v. Argento,* 699 F.2d 874, 895 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983).

legend on the waiver of rights form that Rodgers signed and which read: "I have contacted the Drug Enforcement Administration and I do not want my attorney notified of my cooperation with the government."

Agent Lopez and Officer Rodriguez directly contradicted Rodgers's allegations in their testimony at the suppression hearing. Both testified that the only promise made to the defendant after his arrest was that the prosecutor would be notified if he cooperated with the government. As to the alleged threats made to discourage the defendant from exercising his right to counsel, Lopez testified that he specifically informed Rodgers of his right to counsel after he had given Rodgers the waiver form, and that he never told Rodgers that he could not have a "deal" with the government unless he signed the form. In addition, Rodriguez testified generally that he never heard Lopez or any of the officers threaten Rodgers in any manner during questioning, and specifically that he did not recall hearing anyone state orally to Rodgers that he should not exercise his right to counsel if he wished to cooperate with the government.

After the hearing, the district court denied the motion to suppress, finding that the defendant both waived his *Miranda* rights and made the relevant statements voluntarily and not as a result of any coercion or improper inducement by the officers. In so finding, the court stated: "Any conflict in regard to the recount of the events at the taking of the statement ... is a matter of credibility. I resolve in favor of the agents and against the defendant." Tr. at 110.

■■■ The clearly erroneous standard governs this court's review of a lower court's determination as to the voluntariness of a confession. *United States v. Guerrero-Herrera*, 590 F.2d 238, 242 (7th Cir.1978); *United States v. Shelby*, 573 F.2d 971, 975 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978). The deference that this standard requires is particularly called for when the

determination is made after a suppression hearing in which the trial judge had the opportunity to observe the witnesses and resolve conflicting testimony. *See United States v. Gardner*, 516 F.2d 334, 342 (7th Cir.), *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975). That is precisely the case here. Accepting the officers' version of the events, the only promise they made to Rodgers was that the prosecutor would be notified if he cooperated with them. Such a promise does not render the statements involuntary. *United States v. Springer*, 460 F.2d 1344, 1347 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972).

■■■ The defendant nevertheless argues that the court should have suppressed his statements because he was coerced into waiving his right to counsel since 1) Lopez never specifically denied telling him orally that he could not cooperate with the government if he requested counsel, and 2) the waiver of rights form concededly included the legend, described above, stating that the signer does not want his attorney notified of his cooperation with the government. As to the first ground, while Lopez might not have explicitly denied making the statement in so many words, his and Rodriguez's testimony taken as a whole can be interpreted as a denial of Rodgers's allegation. With regard to the second ground, while we confess our confusion as to the exact purpose and meaning of this legend, we do not deem it sufficient standing alone to establish that the defendant's statements were coerced or involuntary.

**B. Prior Bad Acts Testimony**

Over the defendant's objection, Luisa Davis was permitted to testify at trial about two incidents in 1980 when she saw the defendant in possession of sizeable amounts of cocaine. Davis testified that the first incident occurred when she was with Rodgers and a mutual friend, Mario D'Andrea. D'Andrea asked Rodgers for some cocaine, whereupon Rodgers retrieved a large plastic bag of cocaine and gave D'Andrea a portion. Davis admitted

that she had been freebasing cocaine just before she observed this incident. The second incident occurred when Davis was cleaning a friend's house where Rodgers was staying. Davis testified that she saw Rodgers and a woman in the downstairs bedroom of the house, and then saw them leave the room together. When Davis then entered and began cleaning this bedroom, she saw a large bag of cocaine on the dresser.

The district court denied the defendant's motion in limine to suppress this testimony after the government argued that it was relevant to Rodgers's intent and opportunity under Federal Rule of Evidence 404(b).[15] The government urged that these issues were important in the case because intent to distribute was a basic element of proof on the conspiracy count, and because the amount of cocaine actually seized in the case was so small that the jury might easily doubt Rodgers's intent and/or opportunity to distribute major quantities of cocaine. The defense countered by contending that the acts to which Davis testified were not sufficiently similar to the acts charged at trial to be relevant, that the evidence of the acts was not clear and convincing, and generally that the probativeness of the testimony was outweighed by its potential for prejudice. The defendant basically renews these contentions on appeal.

The test in this circuit provides for the admission of prior crimes or bad acts evidence under Rule 404(b) when:

> (1) the prior act is similar enough and close enough in time to be relevant, (2) the evidence is clear and convincing, (3) the probative value of the evidence outweighs its risk of prejudice, and (4) the evidence is needed to prove an essential element of the charged offense.

*United States v. Kane*, 726 F.2d 344, 348 (7th Cir.1984) (quoting *United States v. Wormick*, 709 F.2d 454, 459 (7th Cir.1983)).

The gist of this test is embodied in the requirement that the probativeness of the proffered evidence be balanced against the potential prejudice to the defendant in each case. *See Kane*, 726 F.2d at 348. Considering all of the relevant factors, we are not certain that the balance weighed in favor of admitting Davis's testimony in this case, and we would be reluctant to speculate as to whether her testimony would have been properly admitted in a closer case.

Nevertheless, after reviewing the record in this case, we are secure in our conclusion that the error in admitting the testimony, if any, was harmless. Because the government's evidence included a series of statements by the defendant himself confessing to his involvement in previous drug transactions, along with the detailed testimony of a former associate as to the defendant's involvement in such transactions, there was little danger that the jury would convict the defendant because of the incidents Davis described. Moreover, the district court properly gave the jury a limiting instruction on the use of prior bad acts testimony. Thus, the admission of Davis's testimony was not reversible error.

### C. Limitation on Cross-Examination of Skeans

Since Michael Skeans was a key government witness at trial, defense counsel attempted to impeach his credibility by cross-examining him as well as other witnesses. Counsel's questioning focused on the prior crimes that Skeans had committed, and particularly on those for which he had originally been charged, but for which he had not been prosecuted after he began cooperating with the government. Defense counsel was able to procure a number of admissions from Skeans that could have seriously reduced his credibility in the minds of the jurors. For example, Skeans admitted during cross-examination that he had been

---

**15.** Rule 404(b) provides:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be

admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

charged in 1983 with drug offenses that could lead to 34 years imprisonment, and that these charges, although dropped temporarily, could be reinstated at any time. Skeans further conceded that he had earlier confessed before a grand jury to the commission of so many crimes that if he were sentenced to one year on each of them, he would be in jail for life.

The cross-examination questions that raised the issue now on appeal concerned an incident at a gas station in Chicago Heights, Illinois in 1981 wherein Mario D'Andrea, with Skeans present, initiated the sale of a kilo of cocaine to Agent Lopez. According to Lopez, D'Andrea panicked during the incident and fired three shots at him, whereupon Lopez returned the fire. D'Andrea died as a result of the gunshot wounds he thereby sustained. The trial testimony also revealed that a federal criminal complaint was filed against Skeans in 1981 on drug charges arising out of this same incident, but that the complaint was later dropped at the government's request.[16] Defense counsel cross-examined both Lopez and Skeans about the incident, and then began asking questions about Skeans's potential liability for felony murder because of D'Andrea's death. The court below sustained the government's objection to these questions.

The defendant claims that the district court's ruling deprived him of his Sixth Amendment right to effective cross-examination of Skeans. *See Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). Specifically, Rodgers argues that Skeans's motive to lie would be increased if he were faced with a possible felony murder charge in Illinois should the government become dissatisfied with his testimony, and that the failure to charge Skeans with felony murder (along with the

dropping of the drug charges) in 1981 casts doubt on the government's position that he had not begun cooperating until 1983. Assuming, *arguendo,* that Skeans could be charged with felony murder in Illinois,[17] this might be relevant to Skeans's motive to lie and the timing of his cooperation with the government.

■ Because, however, "a trial court has discretion to control and limit cross-examination," the test is not mere relevance but instead "whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias." *United States v. DeGudino,* 722 F.2d 1351, 1354 (7th Cir.1983). *See also United States v. Xheka,* 704 F.2d 974, 984 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). As illustrated by the testimony discussed above, defense counsel's cross-examination yielded ample information to allow the jury to make such an evaluation of Skeans. The two issues to which the felony murder questioning relates—Skeans's motive to lie, and when he began cooperating with the government—were raised fully and repeatedly by the questioning concerning Skeans's prior crimes and the dismissal of the charges brought against him in 1981. We therefore find no error in the district court's sustaining of the government's objections to the questioning regarding felony murder.

## V. JURY INSTRUCTIONS

Defendant appeals from the district court's refusal to give his proposed instructions on venue, the effect of drug usage on a witness's ability to perceive and record events, and entrapment. We hold that the district court properly refused these instructions.[18]

---

16. The government claimed that the dropping of these charges was unrelated to Skeans's cooperation with the government, which it contended did not begin until 1983.

17. The parties hotly contested this issue in their briefs, but in light of our holding, we decline to address it.

18. The government contends that we should review the rulings on the venue and drug usage instructions under the plain error standard because the defendant did not make a specific objection to each of these rulings. Because we hold that the trial court's rulings were proper even under a normal error standard, we need not pass on this contention.

## A. Venue

In connection with Count II of the indictment, the defendant submitted a jury instruction to the court stating that in order to convict him on that count the government had to prove beyond a reasonable doubt not only that he was guilty of distributing cocaine on or about the date alleged (August 16), but also that he did so *at the place alleged* (Chicago). Rodgers now appels the district court's denial of the venue component of the instruction, arguing that his theory of defense—that Rodgers did not give Tynes the cocaine that she later gave to Lopez in Chicago, and hence that he did not "cause" her to distribute cocaine—put venue in issue at trial.

 It is clear that a trial court need not give a venue instruction unless venue is specifically in issue. *United States v. Massa*, 686 F.2d 526, 530 (7th Cir.1982). By Rodgers's own analysis, the issue on Count II was whether he was criminally responsible for Tynes's distribution on August 16, not whether that distribution ultimately occurred in Chicago, Illinois. The issue thus was *liability*, not venue. Moreover, the court did explicitly instruct the jury on the defendant's theory of defense as to Count II, and on the law governing vicarious liability in general. The court correctly declined to instruct the jury on venue.[19]

## B. Drug Usage

 As an addition to the standard jury instruction on credibility of witnesses, the defendant proposed the following sentence: "In judging the credibility of a witness you may also take into account the effect, if any, of drug usage upon the witnesses' ability accurately to perceive, remember and recall." The defendant now asserts that the district court's refusal to so highlight the effect of drug usage on the witnesses was error because of Skeans's and Davis's admissions that they had used cocaine at or near the time of the events about which they testified. Further, the defendant emphasizes that Skeans admitted to at one time being addicted to cocaine, and therefore relies on *United States v. Kinnard*, 465 F.2d 566 (D.C.Cir. 1972), which stressed the special need for cautionary instructions concerning the testimony of addict-informants.

Rodgers's reliance on *Kinnard* in particular and the law governing addict-informant instructions in general is misplaced. The rationale underlying *Kinnard* and like cases is that addict-informants are subject to powerful temptations that create a serious risk that they will lie on the stand. *See Kinnard*, 465 F.2d at 572. Thus, under certain circumstances, courts have held that a special instruction should be given concerning the unreliability of their testimony. *Id.* at 569. *See also United States v. Hoppe*, 645 F.2d 630, 633 (8th Cir.), *cert. denied*, 454 U.S. 849, 102 S.Ct. 170, 70 L.Ed.2d 138 (1981); *United States v. Wright*, 542 F.2d 975, 988–89 (7th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977). Rodgers cannot rely on these authorities because, as the First Circuit recently stated in rejecting a similar contention, the instruction requested by the defendant reflected a concern with the witness's "ability to perceive and relate the truth, not with a deliberate misstatement because of the desire to please the government." *United States v. Rosa*, 705 F.2d 1375, 1382 (1st Cir.1983) (affirming district court's refusal to give cautionary instruction on the testimony of a witness under treatment for a mental condition). In essence, the defendant did not even request the kind of instruction contemplated by the cases on addict-informants.

Moreover, any reliability problems with Skeans's and Davis's testimony were sufficiently highlighted for the jury through the testimony and the instructions actually given at trial. Defense counsel was given full rein in his cross-examination of these wit-

---

**19.** We also note that Rodgers's proposed instruction misstated the law on the government's burden in proving venue: the standard is preponderance of the evidence, not beyond a reasonable doubt. *United States v. Martin*, 732 F.2d 591, 593 (7th Cir.1984).

nesses concerning their use of cocaine.[20] In addition, the district court did give a special cautionary instruction on Skeans's and Davis's testimony, noting that the jury had heard testimony that the two had "received benefits from the government in connection with this case." Under these circumstances, it was not error to refuse to emphasize further the witnesses' drug usage in the general credibility instruction.

## C. Entrapment

Finally, Rodgers requested an instruction on entrapment, which the district court also refused. On appeal from this refusal, the two central questions framed by the parties are whether Rodgers could present an entrapment defense although he pleaded not guilty, and whether the evidence at trial sufficiently raised entrapment so as to require an instruction.[21]

The first question arises from the general rule in this circuit that prevents a defendant from denying the act charged and nevertheless pleading entrapment. *See United States v. Liparota*, 735 F.2d 1044, 1048 (7th Cir.1984); *United States v. Nicosia*, 638 F.2d 970, 972–73 (7th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); *United States v. Johnston*, 426 F.2d 112, 114 (7th Cir.1970). Rodgers first seeks to remove this case from the ambit of this rule because he did not take the stand and deny committing the crimes. Therefore, he argues, by pleading not guilty he merely required the government to prove its case, and did not ever take a position strictly inconsistent with an entrapment defense. *See, e.g., United States v. Valencia*, 645 F.2d 1158, 1172 (2d Cir.1980) (holding entrapment defense

available on similar facts). Should we reject this distinction, the defendant urges us to overturn the rule forbidding a defendant from simultaneously denying guilt and pleading entrapment.[22]

Although the defendant's arguments once again tempt this court to reconsider the scope and validity of this rule, the present case, like *United States v. Nicosia:*

> ... is not the vehicle to drive for such a review because ... the evidentiary record on appeal is devoid of any evidence in support of a defense of entrapment calling for an appropriate jury entrapment defense instruction.

638 F.2d at 972–73. We therefore devote the balance of our discussion to explaining why we have found an absence of evidence in the record to support an entrapment defense or instruction.

Perhaps contrary to public perception, entrapment is a narrow defense that arises only when the defendant was not predisposed to commit the crime charged, or when the government "actually implants the criminal design in the mind of the defendant." *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973); *United States v. Gunter*, 741 F.2d 151, 153 (7th Cir.1984). The fact that the government provides an opportunity or solicits a predisposed defendant to commit a crime therefore does not raise an entrapment defense. *See Gunter*, at 153 (in prosecution of defendant for cocaine trafficking, fact that D.E.A. informant initiated contact with defendant did not show entrapment); *United States v. Perry*, 478 F.2d 1276, 1278 (7th Cir.) ("Mere solicitation is not enough to show

---

**20.** For example, Skeans admitted during defense counsel's cross-examination that he hallucinated when he freebased cocaine, stating: "I saw myself in a coffin one time on TV with everybody praying over me." Tr. at 400.

**21.** The court stated that it refused the instruction because the defendant did not argue entrapment in closing arguments, and did not offer any evidence of entrapment at trial. Neither of these grounds is now at issue, however, since the government concedes on appeal that the question is whether the evidence taken as a

whole fairly raised an entrapment defense, regardless of whether such evidence was argued or introduced by the defendant. *See United States v. Gunter*, 741 F.2d 151, 153 (7th Cir. 1984); *United States v. Thoma*, 726 F.2d 1191, 1197 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

**22.** For a collection of the various cases illustrating the split among the circuits on this issue, see Annot., 54 A.L.R.Fed. 644 (1981).

entrapment."), *cert. denied,* 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241 (1973).

The record in this case does not provide any evidence to show that Rodgers was other than predisposed to commit the crimes with which he was charged. The transcripts of the telephone conversations with Lopez and Skeans, along with the testimony of various government witnesses, depicted Rodgers as a person who had long been involved in the drug trade and who was perfectly willing to sell cocaine to Lopez. The defendant argues that his reluctance to travel to Chicago, expressed in his phone conversations with Skeans and Lopez, constitutes evidence that he was not predisposed. Rodgers's reluctance to fly to Chicago, however, does not bespeak a reluctance to sell Lopez a large quantity of cocaine, and it is the latter intent that is relevant to entrapment. Finally, while defense counsel's cross-examination of government witnesses did highlight the defendant's theory that his real intent was to abscond with Lopez's money without ever delivering drugs, the cross-examination failed to elicit any evidence to substantiate this theory.

## VI. CONCLUSION

For the reasons set forth above, the defendant's convictions are AFFIRMED.